# IN THE SUPREME COURT OF TEXAS

═══════════

No. 12-0789

═══════════

TENASKA ENERGY, INC., TENASKA ENERGY HOLDINGS, LLC, TENASKA
CLEBURNE, LLC, CONTINENTAL ENERGY SERVICES, INC., AND ILLINOVA
GENERATING COMPANY, PETITIONERS,

v.

PONDEROSA PINE ENERGY, LLC, RESPONDENT

═══════════════════════════════════════

ON PETITION FOR REVIEW FROM THE
COURT OF APPEALS FOR THE FIFTH DISTRICT OF TEXAS

═══════════════════════════════════════

**Argued January 7, 2014**

JUSTICE GUZMAN delivered the opinion of the Court.

Evident partiality of an arbitrator is a ground for vacating an arbitration award under both the Federal Arbitration Act and the Texas Arbitration Act. Adhering to United States Supreme Court precedent, we held almost two decades ago that a neutral arbitrator is evidently partial if she fails to disclose facts that might, to an objective observer, create a reasonable impression of her partiality. And we have held that a party does not waive an evident partiality challenge if it proceeds to arbitrate without knowledge of the undisclosed facts.

Today, we are asked to evaluate these standards in light of a partial disclosure. Here, the neutral arbitrator in question disclosed that the law firm representing one party to the arbitration had

recommended him as an arbitrator in three other arbitrations. He also disclosed that he was a director of a litigation services company and attended a meeting at the law firm, but there was no indication the firm and company would ever do business. The trial court found the arbitrator failed to disclose that all of his contacts at the 700-lawyer firm were with the two lawyers that represented the party to the arbitration at issue; he owned stock in the litigation services company that was pursuing business opportunities with the firm; he served as the president of the company's United States subsidiary; he conducted significant marketing in the United States for the company; he had additional meetings or contacts with the two lawyers in question to solicit business from the firm for the company; and he allowed one of the two lawyers to edit his disclosures to minimize the contact. The trial court vacated the arbitration award, but the court of appeals reversed, concluding the party waived its evident partiality claim by failing to object or inquire further when the disclosures occurred. We hold the failure to disclose this additional information might yield a reasonable impression of the arbitrator's partiality to an objective observer. We further hold that because the party making the evident partiality challenge was unaware of the undisclosed information, it did not waive the claim. Accordingly, we reverse the court of appeals' judgment and reinstate the trial court's order vacating the award and requiring a new arbitration.

## I. Background

Tenaska Energy, Inc., Tenaska Energy Holdings, LLC, Tenaska Cleburne, LLC, Continental Energy Services, Inc., and Illinova Generating Co. (collectively Tenaska) sold their interests in a power plant in Cleburne, Texas to Ponderosa Pine Energy, LLC (Ponderosa). The purchase agreement contained a broad arbitration clause requiring the parties to arbitrate any dispute arising

2

from or related to the agreement. The clause provided for a three-arbitrator panel, with each party selecting one arbitrator and those two arbitrators selecting the third. The parties conceded in the court of appeals that all three arbitrators were required to be neutral, which follows the current default protocol in arbitration. 376 S.W.3d 358, 361. The clause called for arbitration under the American Arbitration Association (AAA) rules but without AAA administration. It also contained a "baseball arbitration" provision, in which each party would submit a proposed settlement and the panel was bound to select one of the two proposals.

After the transaction closed, the parties disputed whether the agreement required Tenaska to indemnify Ponderosa for breaching certain representations and warranties in the agreement. Ponderosa demanded arbitration and sought more than $200 million in indemnity rights. Lawyers from Nixon Peabody LLP's New York office represented Ponderosa, which designated Samuel A. Stern as its arbitrator. Stern's curriculum vitae was attached to his designation, which indicated he was a director of twelve closely held companies with third-world involvement—including a company in India named LexSite.[1]

At the time, the AAA Commercial Arbitration Rules provided:

Any person appointed or to be appointed as an arbitrator shall disclose . . . any circumstance likely to give rise to justifiable doubt as to the arbitrator's impartiality or independence, including any bias or any financial or personal interest in the result of the arbitration or any past or present relationship with the parties or their representatives. Such obligation shall remain in effect throughout the arbitration.

---

[1] Stern later testified that he served on LexSite's advisory board but was not a director, as his curriculum vitae indicated.

3

Stern disclosed that Nixon Peabody had designated him as an arbitrator in three other proceedings, and that he—on behalf of LexSite—had a discussion at Nixon Peabody's offices about Nixon Peabody outsourcing litigation discovery tasks to LexSite. But the disclosures noted that "Nixon-Peabody and Lexsite have done no business, and it is not clear that Nixon-Peabody would ever have any business to give Lexsite." In response, Tenaska asked if Stern had a relationship with any of the sixteen bank entities that own Ponderosa, and Stern replied that he had no such relationships.

Tenaska designated Thomas S. Fraser as its arbitrator, and Fraser and Stern selected James A. Baker[2] as the third arbitrator. Tenaska asked Baker the same question it asked Stern, and Baker replied that his firm had represented some of the banks that own Ponderosa. At Baker's suggestion, the panel issued a scheduling order that contained a provision stating the parties had made full disclosures of actual and potential conflicts and knowingly waived actual and potential conflicts of interest. After extensive discovery, Ponderosa proposed a $125 million settlement and Tenaska proposed a $1.25 million settlement. A divided panel composed of Baker and Stern selected Ponderosa's $125 million settlement amount.

Ponderosa moved to confirm the award in state district court, and Tenaska moved to vacate it, asserting that Stern was neither impartial nor free from bias. After extensive discovery, the trial court held a hearing on the motions, where the parties admitted almost 500 exhibits. Those exhibits included the depositions of Stern, as well as Frank Penski and Constance Boland—the two lawyers at Nixon Peabody who represented Ponderosa.

---

[2] The late James A. Baker formerly served as a Justice on this Court.

4

The evidence showed that Stern was on the advisory board for LexSite, a legal outsourcing company in India that was seeking to obtain business from law firms in the United States. Stern gave LexSite business and legal advice, and owned 3,000 shares of LexSite stock. He was given options for an additional 10,000 shares, which he had not exercised. Stern contacted Penski in April 2006 to discuss the possibility of Nixon Peabody using LexSite's services. Stern arranged for Penski to meet LexSite's CEO that month. At the subsequent May 3 meeting at Nixon Peabody that Stern did disclose, he made several remarks, mostly asking the firm's associates for their impressions of performing discovery work. After the meeting concluded, Stern told Penski "if you have any arbitrations that would be fun, keep me in mind."

On June 16, Penski asked Stern to serve as a neutral party arbitrator in a matter involving Ada Co-Generation. Stern responded by accepting the appointment and asked if there was "[a]ny movement there" with LexSite. Penski replied that he had talked to numerous partners at Nixon Peabody in an effort to find something to send to LexSite but had "no luck so far." On the suggestion of Boland, another Nixon Peabody partner recommended Stern as an arbitrator in another arbitration on June 19. And on June 26, Penski recommended Stern as an arbitrator in this matter.

Boland later edited Stern's disclosures in two ways. First, she added the Ada-Cogeneration arbitration. Second, she added the disclaimer that "Nixon-Peabody and Lexsite have done no business, and it is not clear that Nixon-Peabody would ever have any business to give Lexsite."

After the parties agreed on the arbitrators, the scheduling order of October 23 established a waiver of conflicts. Three days later, Nixon Peabody changed its fee agreement with Ponderosa

5

from an hourly rate to a contingency fee of 15% of the first $50 million and 12.5% of any amount over $50 million.

LexSite later changed its name to Exactus. Stern incorporated Exactus U.S. and was the chairman of its board.[3] Stern charged LexSite $1,000 for use of his office and $5,000 per month for services. He also met with LexSite's CEO twice a month to discuss such topics as marketing.

LexSite's CEO continued to correspond with Boland during the arbitration. Boland informed LexSite's CEO in April 2007 that "we need to wait about one more month or so until we can continue our discussions. Would you be so kind as to send an email to me again on or about May 15?" LexSite's CEO agreed and noted he had recently met a lawyer from Nixon Peabody's Boston office, who Boland responded was "a good person to know and we can include him, or one of his team, in our meetings later on." On May 7, the panel issued its opinion and award. LexSite's CEO contacted Boland again at the end of May.

After the hearing on the motions, the trial court granted Tenaska's motion to vacate the award on the ground that Stern exhibited evident partiality due to "a calculated, deliberate attempt to minimize the relationship" between Stern and Penksi and Boland. Specifically, the trial court held that Stern did not disclose additional information it summarized as follows:

> When viewed in the totality of circumstances, including the fact that Arbitrator Stern failed to disclose that his contact[s] with Nixon Peabody were all with Mr. Penski or Ms. Boland, failed to disclose additional meetings or contacts regarding Lexsite with Ponderosa[]'s counsel, failed to disclose the true extent of his ties to Lexsite and his activities for Lexsite, and allowed Ponderosa[]'s counsel to modify his

_____

[3] For ease of reference, this opinion will refer to LexSite throughout, even during the time LexSite had reorganized as Exactus.

6

disclosures in a way that minimized the contact, . . . Stern's disclosures were intentionally incomplete and inaccurate.[4]

The trial court concluded that the Nixon Peabody/LexSite relationship was material rather than trivial and the undisclosed information might yield a reasonable impression that Stern was not impartial. Accordingly, the trial court granted the motion to vacate the arbitration award.[5]

The court of appeals reversed. 376 S.W.3d at 360. It held that Stern's disclosures regarding LexSite and the Ada Co-Generation arbitration were sufficient to put Tenaska on notice of potential partiality to require Tenaska to object or seek additional information. *Id.*

## II. Discussion

Our standard of review in this proceeding is a familiar one. Here, the trial court made findings of fact regarding material information Stern failed to disclose and concluded the nondisclosures rendered Stern evidently partial. We defer to unchallenged findings of fact that are supported by some evidence. *McGalliard v. Kuhlmann*, 722 S.W.2d 694, 696–97 (Tex. 1986). But in determining what the law is and applying the law to the facts, a trial court has no discretion. *Huie v. DeShazo*, 922 S.W.2d 920, 927–28 (Tex. 1996) (orig. proceeding). Thus, we determine whether the information the trial court found that Stern failed to disclose is supported by some evidence and

---

[4] The trial court also found that Stern's statements made in selecting the third arbitrator and during the arbitration and his failure to disclose certain bank relationships did not indicate Stern's evident partiality. Tenaska contends in this Court that Stern's statements also support a finding of evident partiality. As explained below, we agree with the trial court that Stern's failure to disclose the extent of his relationships with LexSite, Penksi, and Boland demonstrate evident partiality. Accordingly, we need not assess whether additional statements also demonstrate evident partiality.

[5] The trial court denied the motion to vacate on the grounds that (1) Ponderosa's counsel procured the award by corruption, fraud, or undue means; (2) the arbitrators acted in manifest disregard of the law; and (3) the arbitrators exceeded their power in amending the terms of the purchase agreement.

7

review de novo whether that undisclosed information demonstrates Stern's evident partiality. *Id*.; *McGalliard*, 722 S.W.2d at 696–97.

## A. Evident Partiality

The parties agree the Federal Arbitration Act (FAA) governs this case and allows courts to vacate arbitration awards "where there was evident partiality." 9 U.S.C. § 10(a)(2). The United States Supreme Court has observed that "these provisions show a desire of Congress to provide not merely for any arbitration but for an impartial one." *Commonwealth Coatings Corp. v. Cont'l Cas. Co.*, 393 U.S. 145, 147 (1968). In *Commonwealth Coatings*, a subcontractor sued a prime contractor's surety, and the neutral third arbitrator failed to disclose he obtained approximately $12,000 in business from the prime contractor over a four to five year period (but had done no business with the contractor in the year preceding the arbitration). *Id*. at 146. The Court likened arbitrator impartiality to the impartiality the constitution requires of judges, and observed that even the slightest pecuniary interest in an arbitration could be grounds to set aside the award. *Id*. at 148. Although it recognized arbitrators are not expected to sever their ties with the business world, the Court concluded it must be scrupulous in safeguarding the impartiality of arbitrators because they "have completely free rein to decide the law as well as the facts and are not subject to appellate review." *Id*. at 148–49. To further that goal, the Court imposed "the simple requirement that arbitrators disclose to the parties any dealings that might create an impression of possible bias." *Id*. at 149.[6] Despite the fact that the Court found no evidence of actual bias, it found the arbitrator

---

[6] As Justice White explained in his concurrence:

> The arbitration process functions best when an amicable and trusting atmosphere is preserved

evidently partial due to his failure to disclose his relationship with the prime contractor, justifying vacatur of the award. *Id*. at 146–47, 150.

We addressed evident partiality in *Burlington Northern Railroad Co. v. TUCO Inc.*, where we held that under *Commonwealth Coatings*, a neutral arbitrator exhibits evident partiality "if the arbitrator does not disclose facts which might, to an objective observer, create a reasonable impression of the arbitrator's partiality." 960 S.W.2d 629, 630 (Tex. 1997).[7] And "while a neutral arbitrator need not disclose relationships or connections that are trivial, the conscientious arbitrator should err in favor of disclosure." *Id*. at 637. There, TUCO Inc. and two carriers arbitrated a dispute over a rate adjustment in their contracts. *Id*. at 630. Unlike the present case (which follows the current default protocol to require impartiality or neutrality of all three arbitrators), only the third arbitrator in *TUCO* was required to be neutral. *Id*. The parties agreed to a neutral third arbitrator, George Beall, after he disclosed he had twice served as an expert witness for the law firm of the carriers' arbitrator.[8] *Id*. Those matters had concluded and involved a relatively small amount of time and fees. *Id*.

---

and there is voluntary compliance with the decree, without need for judicial enforcement. This end is best served by establishing an atmosphere of frankness at the outset, through disclosure by the arbitrator of any financial transactions which he has had or is negotiating with either of the parties. . . . [I]t is far better that the relationship be disclosed at the outset, when the parties are free to reject the arbitrator or accept him with knowledge of the relationship and continuing faith in his objectivity . . . .

*Commonwealth Coatings*, 393 U.S. at 151 (White, J., concurring).

[7] Though *TUCO* involved an agreement under the Texas Arbitration Act (TAA), the TAA also requires courts to vacate awards if there has been "evident partiality by an arbitrator appointed as a neutral arbitrator." TEX. CIV. PRAC. & REM. CODE § 171.088(a)(2)(A).

[8] The evident partiality standard the Supreme Court announced in *Commonwealth Coatings*, which we followed in *TUCO*, applies in the context of party appointed arbitrators. *See TUCO*, 960 S.W.2d at 637. We need not decide what standard applies when an arbitration agreement does not allow parties the ability to select arbitrators.

9

Approximately three weeks before the arbitration hearing, a lawyer at the firm employing the carriers' arbitrator assisted in obtaining a referral on a substantial litigation matter for Beall. *Id.* at 631. There was no contention that the carriers' arbitrator knew of the referral or that the lawyer who assisted with the referral knew of the arbitration. *Id.* But the neutral arbitrator mentioned to the carriers' arbitrator at a subsequent meeting that "we've already begun work on the matter you folks were so kind to send over." *Id.* TUCO contended the undisclosed referral rendered Beall evidently partial, and we agreed. *Id.* at 630, 632, 639–40.

We observed that inherent in the arbitration process are two principles that are often in tension: expertise and impartiality. *Id.* at 635. Parties may prefer to resolve disputes through arbitration because they may choose arbitrators with extensive experience in the field related to the dispute. *Id.* But this heightened experience level may well result in an arbitrator having had previous business dealings with a party. *Id.* And while these dealings should not disqualify the arbitrator per se, disclosing the information can help the parties attain the impartiality they seek by evaluating potential bias at the outset of the arbitration. *Id.* This approach also preserves the independence and integrity of arbitration by allowing a party to assess potential bias before arbitrating rather than having a trial court weigh bias when a dissatisfied party challenges an award. *Id.* at 635–36.[9] Accordingly, *TUCO* makes clear that "evident partiality is established from the *nondisclosure itself*, regardless of whether the nondisclosed information necessarily establishes

---

[9] *See Commonwealth Coatings*, 393 U.S. at 151 (White, J., concurring) ("The judiciary should minimize its role in arbitration as judge of the arbitrator's impartiality. That role is best consigned to the parties, who are the architects of their own arbitration process, and are far better informed of the prevailing ethical standards and reputations within their business.").

partiality or bias." *Id*. at 636. Whether the undisclosed information actually establishes partiality or bias is a matter "better left to the parties." *Id*.

We held in *TUCO* that the referral "might have conveyed an impression of Beall's partiality to a reasonable person." *Id*. at 637. Notwithstanding the fact that the lawyer who suggested the referral was unaware of the arbitration and the carrier's arbitrator was unaware of the referral, we concluded that an objective observer could reasonably believe that Beall, grateful for the referral, would favor the firm and thus ultimately favor the carriers in the arbitration. *Id*.

In short, the standard for evident partiality in *Commonwealth Coatings* and *TUCO* requires vacating an award if an arbitrator fails to disclose facts which might, to an objective observer, create a reasonable impression of the arbitrator's partiality, but information that is trivial will not rise to this level and need not be disclosed. *Commonwealth Coatings*, 393 U.S. at 149; *TUCO*, 960 S.W.2d at 630, 637.

We next apply the standard for evident partiality to these facts. Tenaska asserts the information the trial court found Stern did not disclose (which Ponderosa does not challenge on appeal) might create a reasonable impression of partiality to an objective observer because the extent of Stern's relationship with LexSite and Nixon Peabody were more significant and concerning than what he disclosed. Ponderosa counters that, unlike in *Commonwealth Coatings* and *TUCO*, Stern disclosed every relationship Tenaska now complains of. We agree with Tenaska.

Stern disclosed that Nixon Peabody recommended him to three arbitrations in addition to the one at issue, and he met with Nixon Peabody on behalf of LexSite about outsourcing litigation discovery tasks, but stated that "Nixon-Peabody and Lexsite have done no business, and it is not

11

clear that Nixon-Peabody would ever have any business to give Lexsite." The trial court found that Stern did not disclose additional information, and our review of the record confirms this additional information is supported by some evidence:

1.    Stern was a shareholder in LexSite and had the option to purchase additional shares;[10]

2.    When LexSite changed its name to Exactus, Stern incorporated Exactus U.S. and served as its President;[11]

3.    The address and telephone number for Exactus U.S. were Stern's business address and telephone number;[12]

4.    Stern met with LexSite's CEO twice a month to discuss such topics as marketing;[13]

5.    Stern's contacts with the 700-lawyer firm of Nixon Peabody were with Penksi and Boland;

6.    In addition to the May 2006 meeting Stern disclosed, there was a second, earlier meeting in April 2006 for LexSite to solicit business from Nixon Peabody;[14]

7.    The two meetings resulted from phone calls by Stern to Penski;

8.    Ten days after Stern emailed Penski to inquire whether there was "any movement" on Nixon Peabody plans to use LexSite, Ponderosa appointed Stern as arbitrator;

---

[10] Stern testified that he purchased 3,000 shares of LexSite stock and was given stock options for an additional 10,000 more shares but refused to exercise them.

[11] Stern testified that he served as Chairman of the Board of Exactus U.S. and was thus the principal U.S. officer.

[12] Stern testified that he charged LexSite $1,000 for use of his office and $5,000 per month for services.

[13] Stern testified that he met with LexSite's CEO approximately twice a month from 2006 through the time of his deposition in November 2007.

[14] Stern testified that the meeting was to introduce Penski to LexSite's CEO.

9.     Penski and Boland also recommended or assisted with getting Stern recommended as arbitrator in three proceedings just after the May 2006 meeting;

10.     LexSite's CEO (not Stern) contacted Penski and Boland at least twice from November 2006 to April 2007 to discuss possible LexSite business with Nixon Peabody;

11.     Boland edited Stern's disclosures, including the addition of the sentence "Nixon-Peabody and Lexsite have done no business, and it is not clear that Nixon-Peabody would ever have any business to give Lexsite."

Ponderosa does not challenge these findings of fact on appeal, and they are binding on us as they are supported by some evidence. *McGalliard*, 722 S.W.2d at 696–97.[15]

When we examine this undisclosed information together against what Stern actually disclosed,[16] we conclude the information is not trivial and might have conveyed an impression of Stern's partiality toward Penski and Boland's client to a reasonable person. The parties do not dispute that—beyond what he disclosed—Stern owned shares of LexSite, was being paid for office space and services given to LexSite, marketed LexSite in the United States, was actively soliciting business for LexSite from Nixon Peabody (specifically through Penski and Boland), and discussed in communications with Penski regarding the arbitrations the possibility of LexSite and Nixon

---

[15] The trial court also found that Stern failed to disclose that Ponderosa's parent company was the parent company of Ada Co-Generation, which Nixon Peabody recommended Stern to arbitrate a dispute for. Because Stern's nondisclosures regarding his relationship with Penski and Boland via LexSite constitute evident partiality, we need not also address whether the nondisclosures regarding the Ada Co-Generation arbitration constitute evident partiality.

[16] Ponderosa asserts that in cases such as this where part but not all of a relationship is disclosed, a reviewing court should assess not only the information that was withheld but also the information that was disclosed. We agree, and this concern is part of the basis for our holding in *TUCO* that "trivial" information need not be disclosed. 960 S.W.2d at 637. Whether undisclosed information in a partial disclosure situation is trivial should involve comparing the undisclosed information to the disclosed information.

13

Peabody doing business. Taken together, this undisclosed information might cause a reasonable person to view Stern as being partial toward Penski and Boland's client, Ponderosa, to gain their favor in securing business for LexSite from Nixon Peabody. And when compared to the information Stern did disclose (that Nixon Peabody recommended him for four arbitrations and he attended one meeting between LexSite and Nixon Peabody), we cannot say this undisclosed information is trivial. Accordingly, Stern's failure to disclose the extent of his relationship with LexSite and his attempts to secure business for LexSite from Nixon Peabody through Penski and Boland demonstrate evident partiality and support the trial court's vacatur of the award. *See Commonwealth Coatings*, 393 U.S. at 149; *TUCO*, 960 S.W.2d at 630, 636.

Ponderosa contends that disclosure of each relationship suffices under *Commonwealth Coatings* and *TUCO*. But if disclosing each relationship were sufficient, the Supreme Court in *Commonwealth Coatings* and this Court in *TUCO* would have simply established that threshold as the operative test. Instead, the test for evident partiality asks whether the undisclosed "information" might convey an impression of the arbitrator's partiality to an objective observer. *TUCO*, 960 S.W.2d at 635–36 (also referring to disclosing "any dealings" and "facts" that might convey an impression of partiality). Adopting Ponderosa's reformulation of the test would serve to encourage partial disclosures. Such a standard for evident partiality negates the Supreme Court's directive to be "scrupulous to safeguard the impartiality of arbitrators" in a process not subject to appellate review. *Commonwealth Coatings*, 393 U.S. at 149.

Finally, both parties argue we should revisit our holding in *TUCO*. Tenaska asserts that if a court finds disclosures intentionally misleading, evident partiality is established and the inquiry

14

ends. But the standard articulated in *Commonwealth Coatings* and *TUCO* is an objective one (involving what an objective observer might think). *See Mariner Fin. Grp., Inc. v. Bossley*, 79 S.W.3d 30, 32 (Tex. 2002). And although intent may be relevant to establishing actual bias or partiality, we made clear in *TUCO* that evident partiality is established from the nondisclosure itself. 960 S.W.2d at 636. A party need not prove actual bias to demonstrate evident partiality. *Id.*

Ponderosa asks us to adopt the more deferential standard some other courts have employed to only set aside an award for evident partiality if a "reasonable person *would have to conclude* that [the] arbitrator was partial." *Morelite Constr. Corp. v. N.Y.C. Dist. Council Carpenters Benefit Funds*, 748 F.2d 79, 84 (2d Cir. 1984) (emphasis added). As support, Ponderosa contends that adhering to the *TUCO* standard will encourage private investigation by parties that lose in arbitration and require trial courts to more frequently vacate awards. We note that when we adopted the Supreme Court's "full disclosure" rule in *TUCO*, we addressed a similar assertion by one of the parties. 960 S.W.2d at 637. We observed that requiring full disclosure minimizes the role of the courts and, "[i]f faithfully adhered to, it will ultimately lead to fewer post-decision challenges to awards based on bias or prejudice." *Id.* As this is only the second time we have addressed evident partiality in the intervening seventeen years since we decided *TUCO*, our prediction rings true. *See Bossley*, 79 S.W.3d at 30. We cannot agree with Ponderosa's contention that "a losing arbitral party would seize on every undisclosed detail as a material omission" because trivial information will not meet the standard we articulated in *TUCO*. 960 S.W.2d at 637.

Accordingly, we decline Tenaska's request to adopt an intent-based approach to evident partiality and Ponderosa's request to heighten the evident partiality standard we established in

*TUCO.* Stern's failure to disclose information that might lead an objective observer to question his partiality establishes his evident partiality.

## B. Waiver

Ponderosa contends that Tenaska nonetheless waived its complaint as to Stern's partiality by proceeding with Stern after he disclosed each relationship at issue and agreeing to a waiver of conflicts in a scheduling order in the arbitration. Tenaska responds that it did not waive a conflict it was unaware of. The court of appeals agreed with Ponderosa, but we agree with Tenaska.

Our jurisprudence on waiver of an evident partiality challenge demonstrates that a party may waive such a challenge by proceeding to arbitrate based on information it knows. In *TUCO*, the neutral third arbitrator disclosed having previously served as an expert witness on two matters for the law firm that employed the carriers' arbitrator. 960 S.W.2d at 638. TUCO consented to the arbitrator, who did not disclose the firm assisted with obtaining a referral for him during the course of the arbitration. *Id.* at 637-38. The carriers argued that TUCO's consent after full disclosure of the expert witness matters amounted to waiver. *Id.* at 638. We rejected that assertion, concluding that "it is for the parties to determine, after full disclosure, whether a particular relationship is likely to undermine an arbitrator's impartiality." *Id.* We also observed that an objective observer might differentiate between a past relationship (such as the expert witness matters) and one that arises shortly before or during the arbitration (such as the referral). *Id.*

Likewise, we addressed waiver of an evident partiality challenge in *Bossley*, 79 S.W.3d at 33. There, after the arbitration award was issued, one party's witness discovered that she had testified at a deposition two-and-a-half years before that the attorney who chaired the arbitration

16

panel had committed malpractice. *Id*. at 31–32. When the party moved to vacate the award, the opposing party asserted they waived their evident partiality challenge by not raising it before submission. *Id.* at 32–33. We disagreed, holding that they "could not waive an objection that is based on a prior adverse relationship . . . they knew nothing about." *Id*. at 33. Likewise, the concurrence in *Bossley* observed that "[t]here could be waiver of evident partiality based on nondisclosure if the complaining party knew all the facts before the arbitration concluded and did not complain." *Id.* at 36 (Owen, J., concurring).

Here, Tenaska is challenging Stern's partiality based on the information he failed to disclose. Tenaska did not waive its evident partiality challenge by proceeding to arbitration based upon information it was unaware of at that time. *Bossley*, 79 S.W.3d at 33; *TUCO*, 960 S.W.2d at 638. To hold otherwise "would put a premium on concealment" in a context where the Supreme Court has long required full disclosure. *Middlesex Mut. Ins. Co. v. Levine*, 675 F.2d 1197, 1204 (11th Cir. 1982). And we do not share Ponderosa's fear that our adherence to *Commonwealth Coatings*, *TUCO*, and *Bossley* will result in vacating a host of arbitration awards even when a party had reason to know of a potential conflict. If waiver cannot be predicated on undisclosed information, that information must nonetheless be more than trivial to satisfy the standard for evident partiality in *Commonwealth Coatings* and *TUCO*.

Similarly, Tenaska did not waive its partiality challenge in the scheduling order's waiver of conflicts provision because that provision was expressly predicated on a full disclosure that never occurred. The clause provides that Tenaska, Ponderosa,

17

and each member of the Panel in this Arbitration hereby confirm that, as of the date below, they have each: (i) *fully disclosed all conflicts of interest and potential conflicts of interest* with respect to the designation of the members of the Panel in this Arbitration; and (ii) knowingly waived any and all conflicts of interest and/or potential conflicts of interest relating to the designation of the members of the Panel in this Arbitration (emphasis added).

Thus, the parties waived conflicts and potential conflicts for what was fully disclosed. We express no opinion as to whether parties may contractually agree to forego the full disclosure requirement. Because the waiver clause was conditioned on a full disclosure that did not occur, Tenaska has not waived its partiality challenge.

As a final matter, we reiterate that our holding should not be read as indicating that Stern[17] was actually biased. Reasonable people could debate whether Stern's relationship with Nixon Peabody was likely to affect his partiality in the arbitration. But such a debate is for the parties after a full disclosure—which did not occur here. *See TUCO*, 960 S.W.2d at 638.

### III. Conclusion

We have long held that an arbitrator is evidently partial, and an award may be vacated, if the arbitrator fails to disclose facts which might, to an objective observer, create a reasonable impression of the arbitrator's partiality. *Id.* at 630. As we have observed, the most capable arbitrators often have ties to the business community. *Id.* at 639. Regardless of whether such ties demonstrate actual bias here, Stern's failure to disclose the extent of his relationship with LexSite and the two lawyers

---

[17] Stern clerked for Chief Justice Earl Warren before embarking on a distinguished practice of law in Washington, D.C.

18

who represented Ponderosa in this arbitration might yield a reasonable impression of the arbitrator's partiality to an objective observer.  Thus, Stern had a duty to disclose the additional information, and his failure to do so constitutes evident partiality.  Accordingly, we reverse the court of appeals' judgment and reinstate the trial court's order vacating the award and requiring a new arbitration.

_____
Eva M. Guzman
Justice

**OPINION DELIVERED:**  May 23, 2014

19