

# COURT OF APPEALS
## SECOND DISTRICT OF TEXAS
## FORT WORTH

### NO. 02-14-00243-CV

CLASSIC C HOMES, INC. D/B/A                    APPELLANTS
CLASSIC CENTURY HOMES,
CLASSIC CENTURY HOMES, LTD.,
AND CLASSIC CENTURY, INC.

V.

HOMEOWNERS MANAGEMENT                          APPELLEES
ENTERPRISES, INC. D/B/A HOME
OF TEXAS, AND WARRANTY
UNDERWRITERS INSURANCE
COMPANY

----------

FROM THE 67TH DISTRICT COURT OF TARRANT COUNTY
TRIAL COURT NO. 67-259542-12

----------

### MEMORANDUM OPINION[1]

----------

---

[1]*See* Tex. R. App. P. 47.4.

# I. INTRODUCTION

Appellants Classic C Homes, Inc. d/b/a Classic Century Homes, Classic Century Homes, Ltd., and Classic Century, Inc. (collectively Classic) appeal from an amended judgment granted in favor of Appellees Homeowners Management Enterprises, Inc. d/b/a Home of Texas (HOME) and Warranty Underwriters Insurance Company (WUIC). In two issues, Classic argues that the evidence is legally and factually insufficient to prove Classic's breach of contract and that the trial court abused its discretion by awarding attorneys' fees to Appellees. We will affirm.

# II. BACKGROUND

On April 1, 2006, HOME, WUIC, and Classic entered into the "HOME of Texas Warranty Program – Membership Agreement." This contract enrolled Classic as a registered builder in the HOME Warranty Program and required that HOME provide ten years of limited warranty coverage on new houses built by Classic. It also required that WUIC insure the limited warranty program and warrant for structural claims in years three through ten of the ten-year contract. The contract listed the enrollment requirements, construction requirements, and warranty claims requirements of Classic. It required that Classic, "at its own expense, [and] without the intervention of HOME and WUIC, . . . satisfy all warranty issues during years one and two of the warranty term for each home that they warrant through [the HOME Warranty Program]."

2

Further, the contract "indicate[d] that if [Classic] fail[ed] to comply with the years one and two membership obligations, then [HOME] and WUIC [could] recover all of its losses that it . . . incurred." Likewise, the contract made HOME and WUIC liable during years three through ten, without subrogation or indemnification rights against Classic, provided that "the defect or symptoms of the subsequent occurrence of a defect first arose after the expiration of Year 2 of the Warranty in effect for that home," and that "the defect [did] not arise from [Classic's] failure to construct the home in compliance with HOME Warranty Standards" or "from [Classic's] failure to adhere to [its] responsibilities [under the contract]." Similarly, the contract stipulated that Classic would remain liable for any repairs made during year one or two if Classic "failed to adequately repair the defect."

Following the execution of this contract, Classic provided Raquel and Benjamin Santos a limited warranty on their home on July 17, 2008. On April 19, 2010, the Santoses sent a letter to HOME, requesting warranty performance for foundation problems. HOME subsequently notified Classic of this claim and scheduled an inspection of the foundation. Based on this inspection, HOME determined that the issue constituted a major structural defect under the limited warranty. After Classic failed to resolve this issue itself, HOME obtained a repair plan and cost estimate. Based on this information, HOME and WUIC issued a monetary settlement to the Santoses in the amount of $26,050.

3

Similarly, Classic provided Tony and Michelle Moffett a limited warranty on their home on April 25, 2006.  On October 1, 2009, HOME received a letter from the Moffetts' attorney regarding foundation problems.  Not long after sending this request, the Moffetts filed a lawsuit against Classic and HOME.  This action was soon resolved, however, when HOME and WUIC "paid a settlement to [the Moffetts] based upon the foundation claim that was part of the [Moffetts'] lawsuit." The settlement amount was based on a repair plan and cost estimate obtained after HOME performed an investigation of the property.  The investigation revealed signs of foundation failure resulting from "drainage deficiencies," which indicated that the problem likely arose during the first two years of coverage and was a result of improper workmanship.  Ultimately, HOME and WUIC issued a settlement check to the Moffetts for $55,200 and faced additional expenses, such as expert and legal fees, making its total loss on the Moffett home approximately $62,717.

Finally, on January 30, 2006, Classic provided Robert De La Torre and Shawna McGrady a limited warranty on their home.  On September 8, 2010, Robert De La Torre sent a letter to WUIC, requesting warranty performance. Based on the investigative fact-finding report for this home, HOME and WUIC determined that the foundation was suffering from a major structural defect and sent De La Torre and McGrady a settlement check for $7,400.

HOME and WUIC brought action against Classic for breach of contract after Classic failed to reimburse HOME and WUIC for costs and losses incurred

4

as a result of the three warranty claims. Following a bench trial, the court concluded that Classic was liable to HOME and WUIC:

> for all costs and losses which [HOME and WUIC] incurred, including inspection, attorney and expert fees, relating to warranty coverage for the [Santoses' and Moffetts' homes] because the defects on such home[s] arose in the first two years of warranty coverage . . .

> [and because Classic] attempted to conceal or cosmetically repair a defect or symptoms of the subsequent occurrence of a defect during the first two years of the warranty on the [homes] . . .

> [and] failed to construct the [homes] in accordance with building codes, warranty standards, and all special industry standards recognized and approved by HOME which were in force at the beginning of the construction.

However, the court concluded that there was insufficient evidence to hold Classic liable for costs and losses incurred by [Appellees] for the claim made by De La Torre and McGrady. Additionally, it held that "[Appellees] [were] entitled to an award of reasonable attorneys' fees pursuant to Tex. Civ. Prac. & Rem. Code § 38.002 and the contract between the parties."

## III. BREACH OF CONTRACT

In its first issue, Classic argues that the evidence is legally and factually insufficient to support the trial court's judgment for breach of contract. Classic argues that the judgment should be reversed because HOME "proved no costs or losses incurred within years 1 and 2" of the contract and because HOME "presented no competent, admissible evidence of reasonable and necessary expenses allegedly incurred in connection with the Santos and Moffett homes."

5

## A. Standard of Review

A trial court's findings of fact have the same force and dignity as a jury's answers to jury questions and are reviewable for legal and factual sufficiency of the evidence to support them by the same standards. *Catalina v. Blasdel*, 881 S.W.2d 295, 297 (Tex. 1994); *Anderson v. City of Seven Points*, 806 S.W.2d 791, 794 (Tex. 1991); *see also MBM Fin. Corp. v. Woodlands Operating Co.*, 292 S.W.3d 660, 663 n.3 (Tex. 2009). We defer to unchallenged findings of fact that are supported by some evidence. *Tenaska Energy, Inc. v. Ponderosa Pine Energy, LLC*, 437 S.W.3d 518, 523 (Tex. 2014).

Additionally, we may sustain a legal sufficiency challenge only when (1) the record discloses a complete absence of evidence of a vital fact; (2) the court is barred by rules of law or of evidence from giving weight to the only evidence offered to prove a vital fact; (3) the evidence offered to prove a vital fact is no more than a mere scintilla; or (4) the evidence establishes conclusively the opposite of a vital fact. *Uniroyal Goodrich Tire Co. v. Martinez*, 977 S.W.2d 328, 334 (Tex. 1998), *cert. denied*, 526 U.S. 1040 (1999); Robert W. Calvert, *"No Evidence" and "Insufficient Evidence" Points of Error*, 38 Tex. L. Rev. 361, 362–63 (1960). In determining whether there is legally sufficient evidence to support the finding under review, we must consider evidence favorable to the finding if a reasonable factfinder could and disregard evidence contrary to the finding unless a reasonable factfinder could not. *Cent. Ready Mix Concrete Co. v. Islas*, 228

S.W.3d 649, 651 (Tex. 2007); *City of Keller v. Wilson*, 168 S.W.3d 802, 807, 827 (Tex. 2005).

When reviewing an assertion that the evidence is factually insufficient to support a finding, we set aside the finding only if, after considering and weighing all of the evidence in the record pertinent to that finding, we determine that the credible evidence supporting the finding is so weak, or so contrary to the overwhelming weight of all the evidence, that the answer should be set aside and a new trial ordered. *Pool v. Ford Motor Co.*, 715 S.W.2d 629, 635 (Tex. 1986) (op. on reh'g); *Cain v. Bain*, 709 S.W.2d 175, 176 (Tex. 1986); *Garza v. Alviar*, 395 S.W.2d 821, 823 (Tex. 1965).

### B.    Duration of the Indemnification Provision

Classic argues that it cannot be held liable under the contract for costs and losses stemming from the Santoses' and Moffetts' homes because no economic deficiency was incurred by HOME until after the two-year liability period had expired. Accordingly, we consider in our sufficiency analysis the requirements for years one and two builder liability pursuant to the indemnity provisions of the contract.

When interpreting a contract, we read indemnity agreements strictly under the usual principles of contract interpretation to give effect to the parties' intent as expressed in the agreement. *Grant Prideco, Inc. v. Empeiria Conner L.L.C.*, 463 S.W.3d 157, 160 (Tex. App.—Houston [14th Dist.] 2015, no pet.) (citing *Gulf Ins. Co. v. Burns Motors, Inc.*, 22 S.W.3d 417, 423 (Tex. 2000)); *E.I. Du Pont De*

7

*Nemours & Co. v. Shell Oil Co.*, 259 S.W.3d 800, 805 (Tex. App.—Houston [1st Dist.] 2007, pet. denied). We give terms in an indemnity agreement their plain, ordinary, and generally accepted meaning unless the agreement indicates otherwise. *Grant Prideco*, 463 S.W.3d at 160 (citing *Lehmann v. Har-Con Corp.*, 76 S.W.3d 555, 562 (Tex. App.—Houston [14th Dist.] 2002, no pet.). An indemnity agreement is unambiguous if it can be given a definite or certain legal meaning, and we will construe an unambiguous indemnity agreement as a matter of law. *Id.*; *see J.M. Davidson, Inc. v. Webster*, 128 S.W.3d 223, 229 (Tex. 2003); *E.I. Du Pont De Nemours & Co.*, 259 S.W.3d at 805.

The indemnity provision located in Paragraph E.1 of the "HOME of Texas Warranty Program – Membership Agreement" states:

> In consideration of the fee structure granted, [Classic] agrees to reimburse HOME and WUIC for all costs and losses which either incurs, including inspection, attorney and expert fees *relating to coverage during the Years 1 and 2* of a Warranty on a home, regardless of whether [Classic] has breached its obligations hereunder. [Emphasis added.]

Classic argues that it cannot be held liable for the costs and losses incurred by HOME and WUIC because the language of the agreement dictates that HOME and WUIC must have suffered a monetary loss within the initial two-year period for this provision to apply. This argument is unpersuasive, however, given the unambiguous nature of the agreement and the intent of the parties.

The language of the contract demonstrates that HOME and WUIC intended to make Classic liable for costs and losses arising out of year one and

8

two defects, regardless of when HOME and WUIC chose to issue payment. Based on the phrase "relating to coverage during the Years 1 and 2," we cannot agree that Classic would no longer be liable to HOME and WUIC in a situation where a covered defect arose during year one or two but did not cost HOME and WUIC anything until year three. This is further demonstrated by the unambiguous language seen throughout the contract. For example, paragraph E.3 maintains Classic's liability for defects arising during years one or two, in addition to any symptoms of such defects, regardless of when HOME or WUIC incur costs or losses. This paragraph demonstrates HOME's and WUIC's intent to make Classic liable for expenses resulting from year one or two claims, regardless of the date in which the losses actually accrue.

Likewise, Classic argues that the agreement should be construed against its author, HOME, claiming that "[i]f the plain meaning of the words 'cost' and 'loss' are used, then [HOME] is not entitled to indemnity pursuant to their own contract because they did not sustain damages until the date the checks were cut." However, even if construing the agreement in the light most favorable to Classic, when reading these words in the context of the entire contract, the plain meanings of "cost" and "loss" cannot lend support to this claim.

## C. Evidence of Costs for Indemnification

Classic argues that even if the indemnity provision applies, the evidence is insufficient to prove Classic's liability under the contract because the evidence admitted by HOME at trial was inadmissible and, thus, could not prove the costs

9

paid by HOME were reasonable or necessary. The determination of whether to admit or exclude evidence is a matter committed to the trial court's sound discretion. *State v. Bristol Hotel Asset Co.*, 65 S.W.3d 638, 647 (Tex. 2001) (citing *City of Brownsville v. Alvarado*, 897 S.W.2d 750, 753 (Tex. 1995)). Issues regarding the admission or exclusion of evidence require an abuse of discretion standard of review. *In re J.P.B.*, 180 S.W.3d 570, 575 (Tex. 2005).

Classic argues Appellees' evidence was legally and factually insufficient to prove the reasonableness and necessity of expenses incurred because "the court considered inadmissible hearsay." However, Classic does not argue that the trial court abused its discretion by admitting this evidence. Instead, it constructs a seemingly multifarious argument in which it attempts to justify its claim of evidentiary insufficiency by declaring evidence inadmissible without actually arguing that the evidence was, in fact, admitted erroneously. Because Classic is asking us to disregard evidence in the record without making any arguments as to why we should, we will not do so. Accordingly, because Classic failed to assign any error as to the issue of admissibility, we cannot indulge its claim regarding the legal and factual sufficiency of the evidence. We overrule its first issue.

## IV. ATTORNEYS' FEES

In its second issue, Classic argues that the trial court abused its discretion by awarding $48,648.97 in attorneys' fees based on a contingency fee agreement between Appellees and their attorney. The trial court based its

decision on the affidavit and testimony of Appellees' attorney, Kelly Davis.  In her

affidavit, Davis outlined her qualifications as President and sole proprietor of her

law firm in addition to the work she performed on this case.  Further, the affidavit

stated that "[the] lawsuit was brought under a contingent fee arrangement" and

that it "was set based on industry standards as is both reasonable and

customary."  She then requested an award of $53.923.54 for attorneys' fees

"based on the contingent arrangement of thirty[-]three percent (33%) of all

amounts collected after the filing of [the] Lawsuit."  At trial, the court noted that

the usual method of calculating attorneys' fees in breach of contract cases was to

base the amount on an hourly rate; however, the court ultimately chose to award

attorneys' fees based on the thirty-three percent contingency agreement.[2]

While we review the amount awarded under a legal sufficiency standard,

we review the trial court's decision to grant fees under an abuse of discretion

standard.  *Allison v. Fire Ins. Exch.*, 98 S.W.3d 227, 262 (Tex. App.—Austin

2002, pet. granted, judgm't vacated w.r.m.); *Hunt v. Baldwin*, 68 S.W.3d 117, 135

n.8 (Tex. App.—Houston [14th Dist.] 2001, no pet.).  In breach of contract

actions, section 38.001 of the Texas Civil Practice and Remedies Code calls for

---

[2]The trial court initially awarded Appellees damages of $196,093.02 and attorneys' fees amounting to $48,648.97.  Classic then filed a motion to modify judgment and motion for mistrial.  After a hearing, the damage amount was changed in an amended judgment due to the trial court's miscalculation.  This miscalculation had occurred when the court added the contingent attorneys' fees to the final judgment amount.  Accordingly, the amended judgment resulted in $146,093.52 in damages to Appellees and $48,648.97, the same amount as in the first judgment, in attorneys' fees.

11

the recovery of attorneys' fees provided that the party seeking attorneys' fees prevails and is awarded damages. *European Crossroads' Shopping Ctr., Ltd. v. Criswell*, 910 S.W.2d 45, 57 (Tex. App.—Dallas 1995, writ denied); s*ee* Tex. Civ. Prac. & Rem. Code Ann. §§ 38.001(8), 38.002 (West 2015). The trial court has the discretion to fix the amount of attorneys' fees, but it does not have the discretion to deny them if they are proper under section 38.001. *Budd v. Gay*, 846 S.W.2d 521, 524 (Tex. App.—Houston [14th Dist.] 1993, no pet.).

An award of attorneys' fees must be supported by evidence that the fees were both reasonable and necessary. *Haden v. David J. Sacks, P.C.*, 332 S.W.3d 503, 512 (Tex. App.—Houston [1st Dist.] 2009, pet. denied) (citing *Stewart Title Guar. Co. v. Sterling*, 822 S.W.2d 1, 10 (Tex. 1991)); *see European Crossroads'*, 910 S.W.2d at 57. When determining the reasonableness of a fee, the factfinder should consider: (1) the time and labor required, the novelty and difficulty of the questions involved, and the skill required to perform the legal service properly; (2) the likelihood that the acceptance of the particular employment will preclude other employment by the lawyer; (3) the fee customarily charged in the locality for similar legal services; (4) the amount involved and the results obtained; (5) the time limitations imposed by the client or by the circumstances; (6) the nature and length of the professional relationship with the client; (7) the experience, reputation, and ability of the lawyer or lawyers performing the services; and (8) whether the fee is fixed or contingent on results obtained or uncertainty of collection before the legal services have been

12

rendered. *Arthur Andersen & Co. v. Perry Equip. Corp.*, 945 S.W.2d 812, 818 (Tex. 1997).

What constitutes reasonable and necessary attorneys' fees is a question of fact. Clear, direct, and uncontroverted evidence, even evidence from an interested witness, will establish reasonableness and necessity where the opposing party had means and opportunity to disprove testimony but failed to do so. *Cleveland v. Taylor*, 397 S.W.3d 683, 701 (Tex. App.—Houston [1st Dist.] 2012, pet. denied) (holding that attorney's testimony regarding the time spent, services rendered, and fees and costs incurred throughout the case was clear, direct, and uncontroverted evidence that proved amount was reasonable and necessary). The mere fact that a prevailing party and a lawyer have agreed to a contingent fee does not mean that the fee arrangement is in and of itself reasonable. *Arthur Andersen*, 945 S.W.2d at 818. When a contingency fee is requested, it is necessary to prove that the amount that would be awarded based on the percentage agreed to is reasonable and necessary. *See id.* at 818–19 ("A party's contingent fee agreement should be considered by the factfinder . . . . [T]he plaintiff cannot simply ask the jury to award a percentage of the recovery as a fee [] without . . . [a] meaningful way to determine if the fees were in fact reasonable and necessary.").

Classic argues that the trial court's award for attorneys' fees was not supported by sufficient evidence to prove that the amount requested was reasonable and necessary. Classic directs us to the decision in *Cleveland* to

13

support its claim that thirty-three percent of the amended judgment— $48,648.97—was an unreasonable amount. In *Cleveland*, the court held that the amount being requested in attorneys' fees based on a forty percent contingency fee agreement was unreasonable, even though the attorney provided "clear, direct and uncontroverted evidence" that his costs incurred were reasonable and necessary. 397 S.W.3d at 702–03. The court held that this evidence was sufficient to show the reasonableness and necessity of the $155,075.54 being requested by the appellees in that case, but it did not justify a forty percent contingency fee agreement when that agreement increased the award to $500,000. *Id.* at 701–02 ("However, [appellees' attorney's] statement that 40% of the judgment would be a reasonable and necessary fee in light of [his firm's] 40% contingency fee agreement . . . does not justify increasing the fee award beyond the specific amount requested by [appellees]").

Here, Davis requested $53,923.54 based on her pretrial calculations of thirty-three percent of the final judgment. She testified that this amount was reasonable and necessary based on the *Arthur Andersen* factors and put into evidence, without objection, her affidavit and the attached billing statements "to reflect the amount of work that ha[d] gone on in this case." Further, she put into evidence, without objection, a summary of attorneys' fees, demonstrating that her firm had incurred $41,899.86 in fees for this case between March 2012 and January 2014. *See Allison*, 98 S.W.3d at 263 (holding that contingency fee was proven to be reasonable and necessary based on attorney's coverage of the

14

*Arthur Andersen* factors, including the suggestion that the dollar amount be based on the contingent fee, even though attorneys did not submit hourly time sheets). We cannot equate our facts to those in *Cleveland* because here, the contingency fee agreement did not award an amount "beyond the specific amount requested." *See id.*; *see also Cleveland*, 397 S.W.3d at 702. In fact, by basing the award on the contingency agreement, Appellees were awarded $48,648.97, less than what had been requested in Davis's affidavit.

Classic also argues that the contingency fee is unreasonable because it is not the "usual and customary" method of calculating attorneys' fees in breach of contract actions. In the trial court's second amended conclusion of law number 22, it awarded attorneys' fees "pursuant to Tex. Civ. Prac. & Rem. Code § 38.002 and the contract between the parties." While what is usual and customary is a factor to consider when determining the reasonableness and necessity of fees, it is not determinative. *See Arthur Andersen*, 945 S.W.2d at 818–19; *see also* Tex. Civ. Prac. & Rem. Code Ann. § 38.003 (West 2015) (stating that there is a rebuttable presumption of reasonableness when fees are usual and customary). Here, attorneys' fees were proper under section 38.001. Although the trial court honored the contingency agreement by awarding Appellees' thirty-three percent of the final judgment in attorneys' fees, this amount was reasonable and necessary to satisfy section 38.001 and was a proper use of the trial court's discretion to fix fees.

15

Additionally, Classic argues that, by basing the award of attorneys' fees on the contingency agreement, it is being forced to pay fees unrelated to the amount of work performed. We cannot agree. Appellees provided testimony and evidence to prove they had incurred *at least* $40,000 in attorneys' fees for this case through January 2014. Thus, there was sufficient evidence to support the court's award of $48,648.97 under section 38.001, even if that amount was based on thirty-three percent of the final judgment.

Appellees and their attorney provided sufficient evidence to support the trial court's finding of reasonable and necessary attorneys' fees in the amount of $48,648.97. Likewise, the amount awarded fell within the scope of the trial court's discretion to fix reasonable fees under section 38.001 of the Texas Civil Practice and Remedies Code. Accordingly, we cannot agree that the trial court abused its discretion by awarding $48,648.97 in attorneys' fees based on a thirty-three percent contingency fee agreement between Appellees and their attorneys, and we overrule Classic's second issue.[3]

---

[3]In its brief, Classic makes multiple arguments regarding the trial court's miscalculation of damages in the original judgment. However, those arguments are moot because this matter was resolved by the amended judgment signed during the trial court's period of plenary power.

16

## V. Conclusion

Having overruled both of Classic's issues, we affirm the trial court's judgment.

/s/ Bill Meier
BILL MEIER
JUSTICE

PANEL:  LIVINGSTON, C.J.; MEIER and SUDDERTH, JJ.

DELIVERED:  September 17, 2015

17