ACCEPTED
05-15-00339-CV
FIFTH COURT OF APPEALS
DALLAS, TEXAS
7/1/2015 5:18:29 PM
LISA MATZ
CLERK

*Oral Argument Requested*

## No. 05-15-00339-CV

FILED IN
5th COURT OF APPEALS
DALLAS, TEXAS

7/1/2015 5:18:29 PM
LISA MATZ
Clerk

# In the Court of Appeals
# For the Fifth District of Texas
# at Dallas

_____

PONDEROSA PINE ENERGY, LLC,
NIXON PEABODY LLP and
SHANNON, GRACEY, RATLIFF & MILLER, LLP,
Appellants

v.

ILLINOVA CORPORATION,
Appellee

_____

*On Appeal from the 14th District Court*
*Dallas County, Texas; Cause No. 10-04536*

_____

## BRIEF OF APPELLEE ILLINOVA CORPORATION

_____

Mike A. Hatchell
  mahatchell@lockelord.com
  Texas Bar No. 09219000
LOCKE LORD LLP
600 Congress Avenue, Suite 2200
Austin, Texas  78701-2748
(512) 305-4700; (512) 305-4800 Fax

Thomas F. Loose
  tloose@lockelord.com
  Texas Bar No. 12561500
Bradley C. Weber
  bweber@lockelord.com
  Texas Bar No. 21042470
LOCKE LORD LLP
2200 Ross Avenue, Suite 2200
Dallas, Texas 75201-6776
(214) 740-8000; (214) 740-8800 Fax

Counsel for Appellee Illinova Corporation

# IDENTITY OF PARTIES AND COUNSEL

<u>APPELLANTS:</u>
Ponderosa Pine Energy, LLC,
Nixon Peabody LLP and
Shannon, Gracey, Ratliff & Miller, LLP

<u>APPELLANTS' COUNSEL:</u>
B. Frank Cain
  Texas Bar No. 03607500
Joseph W. Spence
  Texas Bar No. 18913500
SHANNON, GRACEY, RATLIFF &
MILLER, LLP
420 Commerce Street, Suite 500
Fort Worth, Texas  76102
(817) 882-7614; (817) 336-3735 Fax

Frank H. Penski
Constance M. Boland
Abigail T. Reardon
NIXON PEABODY LLP
437 Madison Avenue
New York, New York  10022
(212) 940-3000; (212) 940-3111 Fax

<u>APPELLEE:</u>
Illinova Corporation

<u>APPELLEE'S COUNSEL:</u>
Mike A. Hatchell
  Texas Bar No. 09219000
LOCKE LORD LLP
600 Congress Avenue, Suite 2200
Austin, Texas  78701-2748
(512) 305-4700; (512) 305-4800 Fax

Thomas F. Loose
  Texas Bar No. 12561500
Bradley C. Weber
  Texas Bar No. 21042470
LOCKE LORD LLP
2200 Ross Avenue, Suite 2200
Dallas, Texas  75201-6776
(214) 740-8000; (214) 740-8800 Fax

i

# TABLE OF CONTENTS

IDENTITY OF PARTIES AND COUNSEL ............................................................. i

TABLE OF CONTENTS ...................................................................................... ii

REJOINDER TO APPELLANTS' STATEMENT OF FACTS ............................. 2

    A.       The underlying arbitration agreement required quick payment. ............... 3

    B.       Illinova paid the award under protest to halt the accrual of interest and asserted its right to contest the award. ............................................. 3

    C.       Ponderosa and its counsel abetted the grounds on which the arbitration award was vacated. ............................................................ 7

    D.       Ponderosa forced the present suit by refusing Illinova's legitimate right to restitution under the *Miga* decisions. ........................................ 8

    E.       Appellants promised to pay the prejudgment interest they now attack. ................................................................................................... 9

    F.       After it lost in the Texas Supreme Court, Ponderosa again refused to release the Wired Funds to Illinova. ................................................. 10

SUMMARY OF THE ARGUMENT ................................................................... 11

ARGUMENT AND AUTHORITY ..................................................................... 17

    A.       Texas Supreme Court decisions negate application of the voluntary payment rule in cases, like this, where there is an unequivocal reservation of a right to appeal when a tender is made. ......................... 17

        1.    The trial court correctly applied the *Miga* principles to protect Illinova's right to restitution. ................................................... 18

        2.    Appellants' defensive theories misinterpret and mis-apply the *Miga* decisions regarding the necessity of an existing judgment and a binding contract about the nature of the tender. ...................... 22

        3.    The judgment properly implements policy concerns underlying Illinova's restitution claim. ..................................................... 30

    B.       The Trial Court properly awarded Illinova prejudgment interest. ........... 31

1.  Equity supports the trial court's prejudgment interest award...................32

2.  The trial court properly determined prejudgment interest began to accrue 180 days after Illinova's June 7, 2007 Tender Letter...................32

3.  Prejudgment interest was properly calculated. .........................................35

4.  The trial court's award may also be affirmed because Illinova filed a counterclaim seeking restitution on October 3, 2007. ...........................36

C.  The Trial Court properly enjoined Ponderosa from proceeding with the premature second arbitration against Illinova until after the conclusion of all appeals in this case ......................................................37

1.  Ponderosa's second arbitration against Illinova is premature given its position in this case. ...............................................................................37

2.  The injunction meets the requirements for permanent injunctions under Texas law. ...................................................................................38

3.  The injunction appropriately preserves the status quo. ...........................42

4.  Weighing the relative harm to the parties favors injunctive relief. ..........43

D.  The Trial Court properly held Appellants jointly and severally liable................................................................................................44

1.  Appellants jointly promised to pay interest............................................45

2.  Joint and several liability is proper because Appellants acted in concert in withholding the Wired Funds. ................................................46

3.  Equity and public policy support joint and several liability.....................48

PRAYER ........................................................................................................49

CERTIFICATE OF COMPLIANCE.................................................................51

CERTIFICATE OF SERVICE ........................................................................51

# INDEX OF AUTHORITIES

**Page(s)**

CASES

*Alex Sheshunoff Mgmt. Servs., L.P. v. Johnson*,
209 S.W.3d 644 (Tex. 2006) ......................................................................40

*Baltimore & O. R. Co. v. United States*,
279 U.S. 781 (1929)....................................................................................31

*Bluestar Energy, Inc. v. Murphy*,
205 S.W.3d 96 (Tex. App.—Eastland 2006, pet. denied) ..............................45

*BMG Direct Mktg., Inc. v. Peake*,
178 S.W.3d 763 (Tex. 2005) ...............................................................17, 19, 44

*Boquet v. Herring*,
972 S.W.2d 19 (Tex. 1998).........................................................................44

*Brainard v. Trinity Universal Ins. Co.*,
216 S.W.3d 809 (Tex. 2006) ................................................................31, 32

*Brown v. Enter. Recovery Sys.*,
No. 02-11-00436-CV, 2013 WL 4506582 (Tex. App.—Fort Worth Aug.
22, 2013, no pet.) ......................................................................................22

*Citizens Nat'l Bank v. Allen Rae Inv.*,
142 S.W.3d 459 (Tex. App.—Fort Worth 2004, no pet.)................................31

*City of Brownsville v. Longoria*,
No. 13-12-00224, 2014 WL 1370115 (Tex. App.—Corpus Christi April
3, 2014, pet. denied)..............................................................................26, 27

*Cleveland v. Tufts*,
7 S.W. 72 (Tex. 1888)................................................................................19

*CMH Homes v. Perez*,
340 S.W.3d 444 (Tex. 2011) ......................................................................40

*County of Dakota v. Glidden*,
113 U.S. 222 (1885).....................................................................................18

*Dallas County Comty. College Dist. v. Bolton*,
 185 S.W.3d 868 (Tex. 2005) ..................................................................25

*Dorough v. Thornton*,
 450 S.W.2d 424 (Tex. Civ. App.—Fort Worth 1970, writ ref'd n.r.e.) .......46, 47

*Duncan v. Cessna Aircraft Co.*,
 665 S.W.2d 414 (Tex. 1984) ..................................................................48

*Dutcher v. Owens*,
 647 S.W.2d 948 (Tex. 1983) ..................................................................48

*Edwards v. Mid-Continent Office Distribs., L.P.*,
 252 S.W.3d 833 (Tex. App.—Dallas 2008, pet. denied)...................................45

*Exxon Corp. v. Emerald Oil & Gas Co.*,
 348 S.W.3d 194 (Tex. 2011) ..................................................................34

*Freis v. Canales*,
 877 S.W.2d 283 (Tex. 1994) ..................................................................40

*Goode v. Shoukfeh*,
 943 S.W.2d 441 (Tex. 1997) ..................................................................32

*Guynn v. Corpus Christi Bank & Trust*,
 620 S.W.2d 188 (Tex. Civ. App.—Corpus Christi 1981, writ ref'd n.r.e.)........45

*Highland Church of Christ v. Powell*,
 640 S.W.2d 235 (Tex. 1982) ................................................................passim

*Hooker v. Williamson*,
 60 Tex. 524 (1883)..............................................................................23

*Indiana Lumbermen's Mut. Ins. Co. v. State*,
 1 S.W.3d 264 (Tex. App.—Fort Worth 1999, pet denied)................................28

*Johnson & Higgins v. Kenneco Energy*,
 962 S.W.2d 507 (Tex. 1998) ........................................................33, 34, 35, 36

*Lagos v. Plano Econ. Dev. Bd.*,
 378 S.W.3d 647 (Tex. App.—Dallas 2012, no pet.) .......................................38

*Long v. Elliott*,
   416 S.W.3d 152 (Tex. App.—Eastland 2013, no pet.)........................................44

*May v. Buck*,
   375 S.W.3d 568 (Tex. App.—Dallas 2012, no pet.) .........................................11

*MCI Sales & Serv., Inc. v. Hinton*,
   329 S.W.3d 475 (Tex. 2010) .........................................................................11

*Miga v. Jensen,*
   214 S.W.3d 81 (Tex. App. – Fort Worth, 2006), *aff'd*, 299 S.W.3d 98
   (Tex. 2009)..............................................................................................27, 28

*Miga v. Jensen,*
   299 S.W.3d 98 (Tex. 2009)......................................................................passim

*Miga v. Jensen*,
   96 S.W.3d 207 (Tex. 2002)......................................................................passim

*Peacock v. Wave Tex Pools, Inc.*,
   107 S.W.3d 631 (Tex. App.—Waco 2003, no pet.) ..........................................23

*Peticolas v. Carpenter*,
   53 Tex. 23 (1880)........................................................................................19

*Pillitteri v. Brown*,
   165 S.W.3d 715 (Tex. App.—Dallas 2005, no pet.) ........................................24

*Ponderosa Pine Energy, LLC v. Tenaska Energy, Inc.*,
   376 S.W.3d 358 (Tex. App.—Dallas 2012), *rev'd*, *Tenaska Energy, Inc.
   v. Ponderosa Pine Energy, LLC*, 437 S.W.3d 518 (Tex. 2014) ........................11

*R.G. McClung Cotton Co. v. Cotton Concentration Co.*,
   479 S.W.2d 733 (Tex. Civ. App.—Dallas 1972, writ ref'd n.r.e.)...............20, 31

*Robinson v. Brice*,
   894 S.W.2d 525 (Tex. App.—Austin 1995, writ denied)............................33, 34

*Seaborg Jackson Partners v. Beverly Hills Sav.*,
   753 S.W.2d 242 (Tex. App. – Dallas 1988, writ dism'd)..................................43

*Tenaska Energy, Inc. v. Ponderosa Pine Energy, LLC*,
   437 S.W.3d 518 (Tex. 2014) ........................................................2, 8, 11, 29

*In re Tenet Healthcare, Ltd*,
    84 S.W.3d 760 (Tex. 2002)................................................................30

*Town of Flower Mound v. Teague*,
    111 S.W.3d 742 (Tex. App.—Fort Worth 2003, pet. denied)............33

*Trevino v. City of Houston*,
    695 S.W.2d 289 (Tex. App.—Houston [1st Dist.] 1985, writ ref'd n.r.e.) ........28

*United Concrete Pipe Corp. v. Spin-Line Co.*,
    430 S.W.2d 360 (Tex. 1969) .............................................................29

*United States v. Morgan*,
    307 U.S. 183 (1939)..........................................................................18

*W. Beach Marina, Ltd. v. Erdeljac*,
    94 S.W.3d 248 (Tex. App.—Austin 2002, no pet.)............................31

*Wright v. Sport Supply Grp., Inc.*,
    137 S.W.3d 289 (Tex. App.—Beaumont 2004, no pet.) ....................38

*Zodiac Corp. v. Gen. Elec. Credit Corp.*,
    566 S.W.2d 341 (Tex. Civ. App.—Tyler 1978, no writ) ...................48

## CONSTITUTION, STATUTES, AND RULES

TEX. CIV. PRAC. & REM. CODE § 65.001...............................................43

TEX. CIV. PRAC. & REM. CODE § 171.001(a) .......................................38

TEX. FIN. CODE § 304.003(c) ...............................................................35

TEX. R. APP. P. 24.1(a)(2) & (f)...........................................................24

## TREATISES AND LAW REVIEWS

2 George E. Palmer, LAW OF RESTITUTION § 9.9(b) (1978) ...................19

RESTATEMENT (FIRST) OF THE LAW OF RESTITUTION § 74......................19

RESTATEMENT (THIRD) OF RESTITUTION ...............................................26

TO THE HONORABLE COURT OF APPEALS:

The principal issue in this case involves the intersection of the so-called "voluntary payment rule" and the rule that a defendant has a restitution claim following reversal of a judgment paid by the defendant while contemporaneously reserving the right to appeal.

In *Miga v. Jensen*, the Supreme Court held unambiguously:

> When, as here, payment on a judgment is coupled with an expressed intent to appeal when appellate relief is attainable, *see Miga I*, 96 S.W.3d at 212, the voluntary payment rule will not preclude restitution if the judgment is later reversed.

299 S.W.3d 98, 102, 105 (Tex. 2009) ("*Miga II*"). The right of restitution thus has the right-of-way when its conditions are met, as they were here.

Appellants omit *any* discussion of the *holdings* in the *Miga* opinions and would attempt to evade those holdings by asking the Court to engraft two limitations not found in the *Miga* opinions: (i) that the rule of restitution does not apply unless payment is made on a currently enforceable *judgment*, and (ii) the tender is made pursuant to a mutually agreed contract.

This brief will show that both conditions are not only unwarranted, they were in fact rejected by the Supreme Court in the *Miga* decisions.

**REJOINDER TO APPELLANTS' STATEMENT OF FACTS**

The history of this litigation is thoroughly documented in *Tenaska Energy, Inc. v. Ponderosa Pine Energy, LLC,* 437 S.W.3d 518 (Tex. 2014), and need not be repeated. The focus of this appeal – which arises from the vacatur of the arbitration award in that case – is the "voluntary payment rule." Ponderosa relies exclusively on that rule to preserve its status as the arbitration winner – despite its own conduct contributing significantly to the vacatur.[1]

Our Supreme Court has observed that the voluntary payment rule "has diminished in scope" such that it has been applied by the Court only twice in forty years. *Miga II,* 299 S.W.3d at 103. In contrast, Illinova's restitution claim is "rooted in principles of unjust enrichment." *Id.* at 105. Appellants attempt to use the voluntary payment rule for inequitable ends, claiming they can keep the $16.9 million tendered by Illinova despite accepting the tender with explicit knowledge it was made to prevent the accrual of postjudgment interest on the award while preserving the right to challenge it. Similar to Ponderosa's tailoring of arbitrator Stern's disclosures, which led to the evident partiality that voided the arbitration award, Ponderosa's Statement of Facts also is tailored to minimize or obscure the unjust enrichment it seeks by asking this Court to largely ignore policies

---

[1] For example, the Supreme Court noted that Ponderosa's party-appointed "neutral" arbitrator, Stern, "was actively soliciting business from [Ponderosa's counsel] Nixon Peabody (specifically through Penski and Boland)" and "edited Stern's disclosures" in a way that minimized the appearance of partiality. *Id.* at 526.

2

underlying the two *Miga* decisions. Thus, this brief rejoinder on the facts is necessary:

**A.      The underlying arbitration agreement required quick payment.**

The parties' arbitration agreement provides: "The party against which the decision assesses a monetary obligation shall pay that obligation on or before the 30th day following the decision ...." (2RR – Joint Ex. 2, ¶ 9.2(f).) The arbitration award further states that Sellers "shall pay these obligations, without interest, on or before the 30th day following the date of this decision." (2RR – Joint Ex. 6 at 23.) In its petition to confirm the award, Ponderosa sought postjudgment interest after that 30-day period on the proportionate $16.9 million award against Illinova, which would have accrued at 8.25%. (2RR – Joint Exs. 1, 7; CR:752 (Finding of Fact ("FOF") No. 16).)

**B.      Illinova paid the award under protest to halt the accrual of interest and asserted its right to contest the award.**

When the arbitration panel issued its award on May 7, 2007, Ponderosa instantly filed suit in the 191st District Court of Dallas County, Texas (the "191st District Court") seeking confirmation of the award. (2RR – Joint Ex. 7; CR:752 (FOF No. 15).) On June 1, 2007, Illinova wrote Ponderosa that Illinova intended to challenge the arbitration award. (2RR – Joint Ex. 9.)

In the June 1 letter, Illinova further stated that it "desires to make an unconditional tender to [Ponderosa] of the sum of $16,941,000.00 (the "Tender

3

Amount") toward the full satisfaction of the Award in order to terminate the possible accrual of interest on that sum." (2RR – Joint Ex. 9.) Illinova reserved the right to challenge the award and recoup its money, with interest, in the event its challenge was successful:

> Although Illinova may pay the Tender Amount to avoid the potential interest that may accrue on that sum while this case is pending, Illinova explicitly reserves, and does not waive, its rights to (a) challenge the Award, both in the district court and in any subsequent appeals, and if the challenge is successful, (b) recover the Tender Amount plus interest from Ponderosa.

(2RR – Joint Ex. 9.) The letter concluded: "If Ponderosa is willing to accept the Tender Amount and agrees to the termination of the accrual of potential interest on the amount paid, then it should provide me with written wiring instructions and a signed W-9 Form for tax reporting purposes." *Id.*

On June 4, 2007, Nixon Peabody responded for Ponderosa that it was authorized to accept the Tender Amount "in full payment and satisfaction" of the arbitration award and provided wiring instructions to its trust account. (2RR – Joint Ex. 10.) Nixon Peabody added that it was "not authorized to accept the tender of the $16.9 million, as you proposed in your June 1 letter, pending the outcome of Illinova's potential motion to vacate the Award prior to reaching agreement with you on the terms of an escrow agreement acceptable to Ponderosa, Illinova and Nixon Peabody." *Id.* Thereafter, Nixon Peabody provided a signed W-9 form to Illinova. (2RR – Joint Exs. 12, 13.)

4

On June 5, 2007, Ponderosa sent two letters to Illinova. The first stated (wrongly) that full payment of the arbitration award was due on June 5, 2007 and impliedly accused the Sellers of engaging in fraudulent transfers. (2RR – Joint Ex. 14.) In its second letter, Ponderosa threatened that it would seek sanctions against Sellers (including Illinova) and their counsel if Sellers filed claims to vacate the arbitration award. (2RR – Joint Ex. 15.)

On June 6, 2007, Illinova filed a counterclaim seeking to vacate the arbitration award in the action pending in the 191st District Court. (2RR – Joint Ex. 16; CR:753 (FOF No. 22).) The next day, Illinova paid $16,941,000 (the "Wired Funds") to Nixon Peabody's trust account pursuant to the wiring instructions provided. (*See* 2RR – Joint Ex. 17 (the "Tender Letter").) The Tender Letter explained (again) that Illinova's payment was made under protest to stop the accrual of interest on the arbitration award and informed Ponderosa that Illinova reserved its rights to challenge the arbitration award and recoup the payment:

> Please be advised that Illinova has paid the [Wired Funds] under protest to avoid the potential interest that may accrue on that sum while the above-referenced case is pending. As you know, Illinova has filed a counterclaim seeking various relief from the district court, including an order vacating the Award. Illinova explicitly reserves, and does not waive, its rights to (a) challenge the Award, both in the district court and in any subsequent appeals and (b) if the challenge is successful, recover the [Wired Funds] plus interest from Ponderosa.

(2RR – Joint Ex. No. 17.)

Jason Kinzel, a Senior Corporate Counsel employed by Dynegy (Illinova's parent), who managed the defense of the arbitration against Illinova (1RR:19-20), testified, "the reason Illinova paid the award, under protest, unconditionally, was, first of all, we're obligated to pursuant to the award and pursuant to our – the arbitration clause of the Purchase Agreement. Second of all, we believed interest [at a rate of approximately eight percent] would begin to accrue beginning on June 7th, 2007." (1RR:31.)

It was not Illinova's intent to pay the Wired Funds as a full settlement of Ponderosa's claims, nor did Illinova believe that payment of the Wired Funds would preclude it from later getting the money back if its challenge was successful. (1RR:34.) In making the payment, Illinova took into account the Texas Supreme Court's opinion in *Miga v. Jensen*, 96 S.W.3d 207 (Tex. 2002) ("*Miga I*") (1RR:32), which held that tenders like Illinova's – with explicit reservations of the right to appeal and recoup the payment – negated the voluntary rule and preserved a restitution claim.

Ponderosa did not respond to the Tender Letter, but exercised unconditional control over the funds fully aware of Illinova's intent and conditions. Thereafter, Nixon Peabody transferred (1) $14,399,850 to Deutsche Bank to be distributed among the Lender Group, (2) $2,452,209.75 to Nixon Peabody's operating account, and (3) $88,940.25 to Shannon Gracey. (CR:754 (FOF Nos. 31-34).)

6

## C. Ponderosa and its counsel abetted the grounds on which the arbitration award was vacated.

On March 31, 2010, the 191st District Court vacated the arbitration award on grounds of evident partiality. (2RR – Joint Ex. 24; CR:754 (FOF No. 37).)

Given the "unjust enrichment" principles underlying Illinova's restitution claim, it is appropriate to note the role Ponderosa's conduct played in the vacatur, the effect of which Ponderosa now wants to evade through the voluntary payment rule. The trial court found:

> 25. It is very troubling that Ponderosa Pine Energy's counsel edited and modified Arbitrator Stern's disclosures. Arbitrator Stern admitted and the evidence proved that Ponderosa Pine Energy's counsel added the sentence "Nixon-Peabody and Lexsite[2] have done no business, and it is not clear that Nixon-Peabody would ever have any business to give Lexsite." Arbitrator Stern did not disclose that he submitted his disclosures to the party appointing him for modification and/or approval before disclosing them to all of the parties. The addition of this sentence was an attempt by Ponderosa Pine Energy's counsel to minimize the relationship between Arbitrator Stern, Lexsite, and Nixon Peabody and to mislead the Defendants. While Ponderosa Pine Energy's counsel added the sentence, Arbitrator Stern then produced his disclosures with the Nixon Peabody created sentence in them, thereby adopting the language.

> \*\*\*

> 49. Ponderosa Pine Energy's counsel assisted in creating a misimpression regarding Arbitrator Sterns' contacts with Mr. Penski

---

[2] Lexsite was a litigation support company actively soliciting business from Nixon Peabody at the time Arbitrator Stern was designated as an arbitrator by Ponderosa's counsel at Nixon Peabody, and during the arbitration. (*See* 2RR – Plaintiff's Ex. 2 (FOF Nos. 18-24).) Arbitrator Stern did not disclose that he owned an interest in Lexsite. *Id.*

and Ms. Boland regarding Lexsite and the extent of his specific contacts with Mr. Penski and Ms. Boland.

50.    It is very clear that Ponderosa Pine Energy's counsel was attempting to stack the deck in favor of their client.

51.    The Court strongly disapproves of the tenor of the *ex parte* communications between Arbitrator Stern and Ponderosa Pine Energy's counsel.

\*\*\*

56.    Arbitrator Stern and Ponderosa Pine Energy's counsel deliberately misled opposing counsel and obfuscated Arbitrator Stern's relationships or conflicts regarding the Tenaska arbitration.

(2RR – Plaintiff's Ex. 2 (FOF Nos. 25, 49-51, 56).)   Those findings were not challenged on appeal, and the Supreme Court held "they are binding on us as they are supported by some evidence."   *Tenaska,* 437 S.W.3d at 526.   Thus, Ponderosa's conduct, excoriated by the trial court, contributed to the arbitration award and its subsequent vacatur.  (CR:755 (FOF No. 39).)

**D.    Ponderosa forced the present suit by refusing Illinova's legitimate right to restitution under the *Miga* decisions.**

After the vacatur by the 191st District Court, Illinova wrote Ponderosa's counsel and demanded that Ponderosa and Nixon Peabody repay the Wired Funds, plus interest.  (2RR – Joint Ex. No. 25.)  Ponderosa refused.  This prompted Illinova to abandon its counterclaims in the 191st District Court, without prejudice, and bring the underlying action on April 16, 2010.  (CR:754 (FOF Nos. 35-36).) Illinova asserted the same claims for restitution and unjust enrichment it had asserted in its amended counterclaim in the 191st District Court on October 3,

2007. (*Compare* CR:9 (Original Petition in this case) *with* 2RR – Joint Ex. 23 (Illinova's Amended Answer and Counterclaim filed in the 191st District Court).)[3] But, because it was not clear to whom Nixon Peabody had disbursed Illinova's money, Illinova asserted its claims against Ponderosa and its counsel – Nixon Peabody and Shannon Gracey – requesting joint and several liability. (CR:612 (¶¶ 11, Prayer).)

### E.  Appellants promised to pay the prejudgment interest they now attack.

Because an appeal of the 191st District Court's order vacating the arbitration award was pending, the trial court in this case granted Appellants' plea in abatement, and initially ordered Appellants to deposit the Wired Funds, *plus interest*, into an escrow account. (CR:168.) Appellants opposed the requirement that they deposit interest. (*See* CR:173 (recounting events that led to the trial court's initial order, and subsequent disputes).) Following another hearing, the trial court entered a revised order requiring escrow of the Wired Funds, but *without interest*, "based, in part, on the representation of defense counsel that the financial institutions owning an interest in [Ponderosa], along with the other defendants [Nixon Peabody and Shannon Gracey], will pay pre-judgment interest if such is

---

[3] Appellants' brief leaves the false impression that Illinova first sought return of its money when it commenced the underlying case on April 16, 2010. (Appellants Br. at 18.) In fact, Illinova sued Ponderosa for restitution in October 2007 in the 191st District Court. (2RR – Joint Ex. 23; CR:754 (FOF No. 35).)

included in a final judgment in favor of [Illinova]…." (CR:171; CR:755 (FOF Nos. 42-44).)

In compliance with the trial court's order, Illinova, Appellants, and U.S. Bank National Association ("U.S. Bank") entered into an Escrow Agreement, with U.S. Bank acting as agent for an escrow account (the "Escrow Account"). (2RR – Joint Ex. 29.) As of September 21, 2010, the Escrow Account was fully funded by the following:

- Nixon Peabody – $2,452,209.75
- Shannon Gracey – $88,940.25
- KBC – $3,345,690.06
- Deutsche Bank – $2,341,983.04
- CoBank – $1,686,227.79
- Hapoalim – $1,672,845.03
- SocGen – $1,672,845.03
- lNG – $1,338,276.02
- Barclays – $1,338,276.02
- BPM – $1,003,707.02

(2RR – Joint Exs. 30, 31; CR:756 (FOF No. 46).)

### F. After it lost in the Texas Supreme Court, Ponderosa again refused to release the Wired Funds to Illinova.

After the Texas Supreme Court upheld the vacatur of the arbitration award and issued its mandate, the trial court reinstated this case to its active docket. Illinova again requested Ponderosa to agree that the Wired Funds could be disbursed from the Escrow Account to Illinova. Ponderosa again refused, despite the fact that, throughout the litigation and subsequent appeals of the arbitration

award, Ponderosa never claimed or argued that Illinova's payment of the Wired Funds was voluntary, or a settlement of the claims asserted in the arbitration proceeding. (*See* CR:757 (FOF No. 53).) At trial, Ponderosa admitted it never took the position that Illinova's challenge to the arbitration award, and subsequent appeals, should be dismissed as moot because the claims had been settled. (RR:74.)[4]

Following the trial, the judgment herein was rendered and this appeal resulted. (CR:713 (Amended Final Judgment), 762 (Notice of Appeal).)

## SUMMARY OF THE ARGUMENT

The trial court's judgment is supported by extensive fact findings, none of which were challenged by Appellants. Because the findings are fully supported by the record, they are binding on this Court. *Tenaska*, 437 S.W.3d at 526; *see also May v. Buck*, 375 S.W.3d 568, 573 (Tex. App.—Dallas 2012, no pet.) ("Unchallenged findings of fact are binding on the parties and the appellate court.").

---

[4] Appellants attached to their opening brief a First Amended Answer filed in the 191st District Court (where the validity of the arbitration award was being litigated) that was not part of the record below. (Appellants' Br. at 18, Tab 2.) In that Answer, Ponderosa asserted defenses of "payment and the doctrine of unclean hands." (Appellants' Br. at Tab 2 p. 2.) Aside from this bare assertion of "payment," Ponderosa never raised the issue of voluntary payment as a bar to Illinova's challenge to the validity of the arbitration award in the trial court, on appeal to this Court, or in the Texas Supreme Court. *See Ponderosa Pine Energy, LLC v. Tenaska Energy, Inc.*, 376 S.W.3d 358 (Tex. App.—Dallas 2012), *rev'd*, *Tenaska Energy, Inc. v. Ponderosa Pine Energy, LLC*, 437 S.W.3d 518 (Tex. 2014). If need be, this Court may take judicial notice of the arguments raised by Ponderosa in its briefing in this Court and at the Texas Supreme Court. *E.g.*, *MCI Sales & Serv., Inc. v. Hinton*, 329 S.W.3d 475, 497 n.21 (Tex. 2010).

11

**1. Restitution:** Illinova's restitution claim to recoup its payment of the arbitration award is supported by the rule in *Miga II*:

> when, as here, payment on a judgment is coupled with an expressed intent to appeal when appellate relief is attainable, … the voluntary payment rule will not preclude restitution if the judgment is later reversed.

*Miga II*, 299 S.W.3d at 102, 105.  It is undisputed that Illinova tendered payment in strict compliance with that rule, advising Ponderosa

> that Illinova has paid the Tender Amount under protest to avoid the potential interest that may accrue on that sum while the above-referenced case is pending.  As you know, Illinova has filed a counterclaim seeking various relief from the district court, including an order vacating the Award. Illinova explicitly reserves, and does not waive, its rights to (a) challenge the Award, both in the district court and in any subsequent appeals and (b) if the challenge is successful, recover the Tender Amount plus interest from Ponderosa.

(2RR – Joint Ex. No. 17.)

Appellants' attempt to avoid that rule under the now-diminished and seldom-applied voluntary payment rule rests on two faulty premises:

First, Appellants misconstrue the *Miga* decisions in arguing that an existing court *judgment* is required to invoke the rule.  The coercive effects that underlie the *Miga* decisions are found in the obligation created by the arbitration award itself, Ponderosa's immediate attempt to confirm the award in court, the draconian sanctions threatened by Ponderosa for challenging the award, and the exorbitant interest at 8.25% on $16.9 million that would have accrued during the confirmation

process and subsequent appeals. Ponderosa also fails to note that, because it was superseded, the judgment in *Miga* was unenforceable at the time payment was tendered, so the threat of postjudgment collection actions by the judgment creditor did not exist in that case.

Second, the argument that there must be a binding agreement for the *Miga* rule to apply was flatly rejected in *Miga II* where the Court found the parties disagreed on the right to appeal after the payment.

Moreover, while existing Texas Supreme Court decisions are sufficient, the trial court's judgment is consistent with policy concerns underlying restitution claims, like Illinova's, following reversal of the judgment on which payment was made under protest or coercively. Texas public policy favors arbitration. No principled reason exists for relieving a judgment debtor from the Hobson's choice of avoiding potentially crushing postjudgment interest at the risk of losing the right to appeal, while not extending that same relief to an arbitration debtor. Finally, Appellants' position creates a potential trap for the unwary that is incongruous with the equitable principles underpinning restitution.

**2. Equitable prejudgment interest:** Appellants have not challenged the trial court's findings that Ponderosa's conduct, through its counsel, abetted the circumstances that inflicted arbitrator Stern with the "evident partially" that voided

13

the arbitration proceedings from their inception. Their arguments to now avoid paying the interest – which they previously agreed to pay – fail for two reasons:

First, the award of prejudgment interest is properly based on equitable considerations. The trial court did not abuse its discretion because Ponderosa's misconduct, and related threats of draconian sanctions for daring to challenge arbitrator Stern, contributed to the coercive effect of the arbitration award that required Illinova to make its tender under protest, resulting in Appellants' unfettered use of Illinova's money for years.

Second, the trial court properly calculated the interest to begin accruing 180 days after Illinova's June 7, 2007 letter, which was written notice of Illinova's claim. And, even if that letter was not sufficient written notice to trigger the accrual of prejudgment interest, Illinova filed its counterclaim seeking restitution on October 3, 2007, and the trial court's prejudgment interest award could be affirmed based on that accrual date as well.[5]

**3. Injunction:** Ponderosa's attempt to simultaneously pursue a second arbitration against Illinova while appealing this restitution case smacks of an inequitable attempt to gain tactical advantage through attrition.

---

[5] If the trial court had used October 3, 2007 as the beginning accrual date it would have resulted in *a larger amount* of prejudgment interest than what was awarded using December 5, 2007 as the beginning accrual date.

14

For at least four reasons, the trial court did not abuse its discretion by enjoining Appellants from proceeding with a premature second arbitration on a parallel track with this restitution case.

First, Ponderosa asserted the same claims in the second arbitration that it contends were settled by Illinova's payment of the Wired Funds. Until this appeal is finally resolved, a second arbitration to decide Ponderosa's indemnity claims is an inefficient waste of the parties' resources.

Second, the harm from proceeding with a second arbitration was imminent – Ponderosa had served its demand for arbitration and Illinova would have quickly begun to incur the costs and expenses of a potentially unnecessary arbitration.

Third, injury to Illinova from a parallel and potentially meaningless arbitration would have been irreparable. There is no statutory or contractual basis for Illinova to recover the expenses it necessarily would have incurred in a second arbitration. Moreover, if Ponderosa had been permitted to proceed immediately with a second arbitration, it would have put Illinova in the untenable position of defending in two forums where Ponderosa could subsequently elect the more favorable outcome from either this appeal or the second arbitration. The trial court's weighing of those considerations insulates its ruling from abuse of discretion.

Fourth, Illinova had no adequate legal remedy from the effects of a potentially meaningless second arbitration, because no legal proceedings could un-ring the bell and restore the pre-arbitration status quo once the second arbitration was underway.

**4. Joint and Several liability:** The imposition of joint and several liability also was subject to abuse of discretion principles. The trial court did not abuse its discretion by imposing joint and several liability for three reasons:

First, Ponderosa's counsel promised that *all* Appellants would pay interest if it was included in a final judgment. Illinova and, more importantly, the trial court relied on counsel's representation and Appellants consequently were not required to deposit an additional amount for prejudgment interest in the Escrow Account.

Second, *all* Appellants acted in concert in withholding Illinova's money and using it for their own benefit for over three years.

Third, public policy supports the trial court's exercise of discretion. Joint and several liability is a mechanism designed to protect plaintiffs and provide them with full relief. Illinova should not be burdened with tracking down (and potentially bringing suit against) all of the entities to which its money was disbursed by Appellants, nor should it be put at risk of their insolvency.

16

## ARGUMENT AND AUTHORITY

**A.**  **Texas Supreme Court decisions negate application of the voluntary payment rule in cases, like this, where there is an unequivocal reservation of a right to appeal when a tender is made.**

In basing their appeal exclusively on the voluntary payment rule, Appellants would take Texas law back to a bygone era, resurrect now-repudiated reasoning, and ask this Court to flat ignore unambiguous rules for preserving restitution claims in cases like this. Indeed, they go so far as to characterize Illinova's restitution claim as merely a "narrow" exception to the voluntary payment rule (*e.g.*, Appellants' Br. at 26, 29, and 32), when, in fact, the Supreme Court called the voluntary payment rule an "exception" to the right to restitution after payment of a reversed judgment. *Miga II*, 299 S.W.3d at 102.

Largely "diminished in scope" and now subservient to "principles of unjust enrichment," *Miga II*, 299 S.W.3d at 103, 105, "the voluntary-payment rule is no longer outcome determinative when deciding whether a judgment voluntarily paid moots an appeal. Now, the payment of a judgment without an 'expressed intent' to continue an appeal moots the appeal, but payment with such an expression does not." *BMG Direct Mktg., Inc. v. Peake*, 178 S.W.3d 763, 770 (Tex. 2005) (quoting *Miga I*, 96 S.W.3d at 212). The Texas Supreme Court explained that "[t]he Texas rule is not, and never has been, simply that any payment toward satisfying a judgment, including a voluntary one, moots the controversy and waives the right to

17

appeal that judgment." *Miga I*, 96 S.W.3d at 211. The goal of the *Miga* decisions was to clear the way for a judgment debtor to abate the accrual of exorbitant interest on a multi-million dollar judgment, while preserving the right to appeal. In *Miga I*, the Court wrote:

> One must be able to halt the accrual of post-judgment interest, yet still preserve appellate rights. Whether a party wishes to avoid the accrual of post-judgment interest, particularly on a multi-million dollar judgment, is a question that party should be able to decide without fear of a Hobson's choice—that is, that the party might presumptively waive its appellate prospects.

*Miga I*, 96 S.W3d at 211. Clearly, Illinova was motivated by the same concerns and its conduct slavishly follows the holdings in *Miga I* and *II* confirming the viability of Illinova's restitution claim under virtually identical (if not more compelling) circumstances.

### 1. The trial court correctly applied the *Miga* principles to protect Illinova's right to restitution.

The principles that underlie the judgment are clear. "Restitution after reversal has long been the rule in Texas and elsewhere." *Miga II*, 299 S.W.3d at 101. This principle has been cited or applied by the United States Supreme Court,[6]

---

[6] *E.g.*, *United States v. Morgan*, 307 U.S. 183, 197 (1939) ("What has been given or paid under the compulsion of a judgment the court will restore when its judgment has been set aside and justice requires restitution." (citations omitted)); *County of Dakota v. Glidden*, 113 U.S. 222, 224 (1885) ("There can be no question that a debtor against whom a judgment for money is recovered, may pay that judgment, and bring a writ of error to reverse it, and if reversed can recover back his money . . . by means of a writ of restitution.").

as well as the Texas Supreme Court,[7] for more than a century.  The leading treatise

on restitution explains that: "Almost as a matter of course, restitution usually has

been granted of money paid or other benefits transferred under a judgment

subsequently reversed."  2 George E. Palmer, LAW OF RESTITUTION § 9.9(b) (1978)

(citing RESTATEMENT (FIRST) OF THE LAW OF RESTITUTION § 74)).

> Current Texas law is now succinctly stated in *Miga II:*

> When, as here, payment on a judgment is coupled with an expressed
> intent to appeal when appellate relief is attainable, … the voluntary
> payment rule will not preclude restitution if the judgment is later
> reversed.

*Miga II*, 299 S.W.3d at 105.

Underlying that holding are at least three policy considerations:

First, the voluntary payment rule has "diminished in scope, as 'the rule's

equitable policy concerns have been addressed through statutory or other legal

remedies.'"  *Miga II*, 299 S.W.3d at 103 (citing *Peake,* 178 S.W.3d at 771).

Second, the primary purpose of the rule is to prevent deception about the

nature of a payment by a judgment debtor.  *Miga II,* 299. S.W.3d at 103.  "A party

should not be allowed to mislead his opponent into believing that the controversy

is over and then contest the payment and seek recovery."  *Highland Church of*

*Christ v. Powell*, 640 S.W.2d 235, 236 (Tex. 1982); *see also Peake*, 178 S.W.3d at

---

[7] *E.g., Cleveland v. Tufts*, 7 S.W. 72, 74 (Tex. 1888) ("money paid upon a judgment afterwards reversed may be recovered by the party making the payment" (citations omitted)); *Peticolas v. Carpenter*, 53 Tex. 23, 29 (1880).

768-69 (A party "should not pay out his money, leading the other party to act as though the matter were closed, and then be in a position to change his mind and invoke the aid of the courts to get it back.") (quoting *R.G. McClung Cotton Co. v. Cotton Concentration Co.*, 479 S.W.2d 733, 743 (Tex. Civ. App.—Dallas 1972, writ ref'd n.r.e.)).

Third, no such deception exists, however, when a judgment creditor takes payment on a judgment knowing the other party intends to appeal. In *Miga II*, the Court remarked that "[p]rohibiting restitution would penalize [the judgment debtor] for the court's mistake and is inimical to the unjust enrichment principles underlying the doctrine." *Id.* at 105. That concern is magnified when the judgment creditor's conduct plays a role in the reversal of the underlying judgment, as is it did in this case.

Illinova's restitution claim falls squarely within holdings in the *Miga* decisions and the trial court's judgment honors the principles undergirding them:

- Illinova paid the Wired Funds under protest, informed Ponderosa that it already had challenged the arbitration award in court, and expressly reserved the right to challenge the arbitration award and to recover the Wired Funds (plus interest) if its challenge was successful (2RR – Joint Ex. 17);

- Illinova challenged the arbitration award while judicial relief was attainable; and

- Illinova's position ultimately was vindicated when the arbitration award was vacated by the Texas Supreme Court.

20

*Tenaska Energy, Inc. v. Ponderosa Pine Energy, LLC*, 437 S.W.3d 518 (Tex. 2014).

Indeed, the circumstances underlying Illinova's restitution claim are more compelling than Jensen's in the *Miga* litigation. Jensen only "informed Miga" orally of his intent to continue the appeal during the negotiations about his payment, but, as an essential part of its payment, Illinova's Tender Letter explicitly reserved the rights to challenge the award and recover the Wired Funds (plus interest). *See Miga I,* 96 S.W.3d at 212; *see also Miga II*, 299 S.W.3d at 102; (2RR – Joint Ex. 17.) Calling attention to the fact that Jensen's reservation was made orally, *Miga I* praises Illinova's explicit *written* reservation of its claim and intent to appeal as the "safe practice" and the "optimal" approach to unambiguously preserve the right of restitution conclusively. *Miga I*, 96 S.W.3d at 211-12.

Given Illinova's unequivocal writings, Appellants' focus (Appellants' Br. at 15-17, 30-33) on the uncommunicated mental processes underlying Illinova's Tender Letter is meaningless. The letter unambiguously states:

> Illinova explicitly reserves, and does not waive, its rights to (a) challenge the Award, both in the district court and in any subsequent appeals and (b) if the challenge is successful, recover the Tender Amount plus interest from Ponderosa.

(2RR – Joint Ex. 17.) To paraphrase *Miga I*, after receiving that letter "[Ponderosa] could not have had any reasonable doubt that [Illinova] believed …

21

that [Illinova] intended to pursue the appeal if legally allowed to do so." 96 S.W.3d 212. That reservation satisfied the core requirement of *Miga II* that "payment … coupled with an expressed intent to pursue [an] appeal" forecloses application of the voluntary payment rule. 299 S.W.3d at 101.[8]

Appellants' arguments can only be an invitation to flout the *Miga* decisions, which, in fact, they do in the only two arguments seriously made.

### 2. Appellants' defensive theories misinterpret and mis-apply the *Miga* decisions regarding the necessity of an existing judgment and a binding contract about the nature of the tender.

Appellants try to wriggle free of the *Miga* decisions with two meritless theories: (a) that the *Miga* decisions require an existing judgment at the time the

---

[8] The Texas Supreme Court decisions are all the authority necessary, but it is worth noting how the recent decision in *Brown v. Enter. Recovery Sys.*, No. 02-11-00436-CV, 2013 WL 4506582, at *1 (Tex. App.—Fort Worth Aug. 22, 2013, no pet.), shows that Texas courts ratify Illinova's arguments. In that case, the Browns suffered a judgment for court costs and tendered payment along with a request that Enterprise Recovery Systems ("ERS") file a notice of satisfaction of judgment, which it did. *Id.* The court rejected ERS's argument that the voluntary payment rule rendered the Browns' subsequent appeal moot based on the Browns' letter notifying ERS that they "'intend to and will appeal the judgment[; and that] '[t]his letter charges you with notice that excepted from any payment tendered in satisfaction of [the judgment] is [the Browns'] right to appeal.'" *Id.* at *2 (quoting the letter).

The Fort Worth court concluded that ERS knew the Browns intended to appeal before it filed its satisfaction of judgment, the Browns did not mislead ERS into acting as though the matter were closed, and the "voluntary payment rule is not as harsh as ERS portrays it." *Id.* at *2 (footnotes omitted). The court found that the Browns' reservation negated the voluntary payment rule because it is applied principally "'to prevent a party who has freely decided to pay a judgment from changing his mind and seeking the court's aid in recovering the payment'" and to keep "a party from paying out money and leading the other party to act as though the matter were closed" only to later invoke the aid of the courts to get it back. *Id.* at *2 (citing *Highland Church*, 640 S.W.2d at 236, and *Miga II*, 299 S.W.3d at 103).

Our case is more compelling, because the reservation of the right to appeal accompanied the tender, whereas the Browns' notice was *after* payment was tendered.

tender is made and (b) the tender must be made under a binding contract. Both arguments are wrong:

### a. An existing judgment is not required.

Appellants' argument that the *Miga* decisions require "the coercive effect of a[n] [existing] judgment" (Appellants' Br. at 32) would mean that a defendant's payment of a judgment on Tuesday after a trial court announces it will sign a plaintiff's draft judgment on Wednesday is a voluntary payment, while a payment on Thursday is not. This is legal nonsense that ignores the nature of the coercion in the *Miga* decisions, the analogous coercive effects on Illinova in this case, and the policy considerations underlying those decisions.

First, the fact that the tender was made following an arbitration award changes nothing. "An arbitration award is in the nature of a judgment." *Peacock v. Wave Tex Pools, Inc.*, 107 S.W.3d 631, 636 (Tex. App.—Waco 2003, no pet.) (citing *Hooker v. Williamson*, 60 Tex. 524, 526 (1883)). Indeed, the arbitration award itself coercively ordered the Sellers, including Illinova, to pay the amounts awarded on or before the 30th day following the date of the decision. (CR:752; (FOF No.14); 2RR – Joint Ex. 6 at 23.)

Second, before Illinova's tender, Ponderosa filed a petition to confirm the award (2RR – Joint Ex. 7), which itself is sufficient for *Miga's* "coercive effect," given the narrow grounds to deny confirmation.

23

Third, Ponderosa immediately ratcheted up the coercive effect of the award by threatening draconian litigation and sanctions if Illinova dared to contest the award. (2RR – Joint Exs. 14-15, CR:753 (FOF Nos. 20-21).) That is surely more coercive than the "embarrassment" that *Miga II* found pertinent in *Highland Church,* 640 S.W.2d at 237. *See Miga II,* 299 S.W.3d at 104.

Fourth, the arbitration award coercively ordered postjudgment interest after the expiration of 30 days, just like a judgment. (2RR – Joint Ex. 6 at 23; CR:753 (FOF No. 14).) In its petition to confirm the arbitration award (2RR – Joint Ex. 7 at 10), Ponderosa sought postjudgment interest consistent with Texas law that arbitration awards earn postjudgment interest in the same manner as other judgments. *Pillitteri v. Brown*, 165 S.W.3d 715, 721 (Tex. App.—Dallas 2005, no pet.). At that time, the rate for postjudgment interest was 8.25%. (2RR – Joint Ex. 1.) If Illinova had not made its unconditional tender, interest would have accrued at a *daily* rate of $3,829.13. Thus, Illinova faced the same type of economic coercion that all judgment debtors face. Such a crushing toll is the motivating principle underlying the *Miga* rule. *E.g. Miga II*, 299 S.W.3d at 104.

Finally, the *Miga* decisions themselves suggest that no presently enforceable judgment is required to coincide with payment under a fully-litigated claim. At the time Jensen made his payment, he had posted a supersedeas bond, 299 S.W.3d at 100, and thereby suspended the enforcement of the judgment. TEX. R. APP. P.

24

24.1(a)(2) & (f).[9]  Thus, even though the judgment was suspended and lacked present enforceability, the Supreme Court found it to have sufficient coercive effect to bar the voluntary payment rule.[10]

None of the cases that discuss involuntary payment state that a judgment, as opposed to some other coercive obligation, is a prerequisite to restitution. Conversely, nothing in the cases cited by Appellants so holds.

For example, in *Dallas County Comty. College Dist. v. Bolton*, 185 S.W.3d 868, 870 (Tex. 2005), the issue was not the existence of a judgment, but the absence of *any* protest by the complaining students at having to pay a "technology fee." The voluntary payment rule was applied, because the students "had the option … to seek an exemption from all or part of the fee from the District," *id.* at 880, but the court went out of its way to observe that, "if there were evidence that students sought waivers and were denied them, *or that the students made any protest at all at the time of payment*, the Court's analysis might be different." *Id.* (emphasis added). The court's proviso later became the law in *Miga II*, when the Court required that payment be "coupled with an expressed intent to appeal." 299 S.W.3d at 105.  That is consistent with the purpose underlying the voluntary

---

[9] Certainly, Illinova faced the same coercion as Jensen – just as Miga could not execute on the judgment because Jensen superseded it, Ponderosa could not execute on the arbitration award because it had not been confirmed.

[10] For that reason, Appellants' recitation of rights and remedies available to judgment creditors (Appellants' Br. at 35) is no more relevant here than it would have been in *Miga II*.

25

payment rule that one "should not be allowed to mislead his opponent into believing that the controversy is over and then contest the payment and seek recovery." *Highland Church*, 640 S.W.2d at 236.

Also inapposite is *City of Brownsville v. Longoria*, No. 13-12-00224, 2014 WL 1370115 (Tex. App.—Corpus Christi April 3, 2014, pet. denied). In that case, a police union obtained a money judgment against the city. *Id.* at *1. While the case was on appeal, the city entered negotiations with the union to finally resolve the suit as part of negotiations for a new collective bargaining agreement. *Id.* at *7. Thereafter, a different union (firemen) claimed the additional benefits under a clause in its collective bargaining agreement that entitled the union to any benefits the city "voluntarily negotiate[d]" in an across the board wage increase with another union. *Id.* at *1. The court rejected the city's argument that it did not "voluntarily" negotiate a settlement agreement with the police union because there was no question that the city's negotiated settlement was intended to end the controversy. That fact puts the case squarely within the voluntary payment rule. *See Highland Church*, 640 S.W.2d at 236 ("Voluntary payment ends the controversy."); *see also* RESTATEMENT (THIRD) OF RESTITUTION & UNJUST ENRICHMENT § 18 cmt. c ("a payment by way of compromise and settlement, where the purpose of the agreement is to effect a final resolution between the parties irrespective of the validity or correctness of any prior decrees, is not subject

26

to recovery in restitution unless the agreement of compromise may itself be avoided …").[11]  Conversely, the Supreme Court has held that "'implicit in reserving a right to appeal is the right to a refund of the money in the event that the judgment is later modified or reversed. '" *Miga II,* 299 S.W.3d at 102 (quoting the holding in *Miga v. Jensen,* 214 S.W.3d 81, 89 (Tex. App. – Fort Worth, 2006), *aff'd*, 299 S.W.3d 98 (Tex. 2009)).

In this case, Appellants cannot seriously contend that Illinova's payment – made under protest with a reservation of the right to continue the litigation – was counterintuitively intended to end the controversy.  The accompanying documents said just the opposite and Appellants could have no mistake about Illinova's intent to appeal and, if successful, claim restitution.

### b.  No contract is required.

Appellants flout *Miga II* again when they insist that Illinova has no right of restitution because Illinova "never reached an agreement with Ponderosa regarding the payment."  (Appellants' Br. at 22.)  The necessity for such an agreement was rejected in both *Miga* decisions.  It was Jensen's *notice* that he intended to appeal

---

[11] Confusingly, Appellants say "*City of Brownsville* teaches that unless the payment is made pursuant to the judgment as written, and not pursuant to a compromise and a settlement which relieves a party from certain obligations set forth in the judgment, the payment is voluntary." (Appellants' Br. at 32.)  This is a false dichotomy, unsupported by the opinion, and contrary to the holdings in *Highland Church*, *Miga I*, and *Miga II*.  It is also the opposite of the *City of Brownsville* holding – the city paid pursuant to a compromise and settlement that relieved it of certain obligations under the judgment (court costs, delay of a lump sum payment, and post-judgment interest), yet the court held the payment *was* voluntary.  2014 WL 1370115, at *7.

27

that kept the restitution claim alive, not an agreement that Miga accepted the payment with that condition:

> We concluded [in *Miga I*] ...that *the parties agreed to disagree*: "[w]hile Miga may have believed that Jensen's payment mooted the appeal, he could not have had any reasonable doubt that Jensen believed it did not, or that Jensen intended to pursue the appeal if legally allowed to do so. … [T]he parties no more agreed that Jensen could not seek reimbursement than they agreed he could.*

*Miga II*, 299 S.W.3d at 102 (quoting *Miga I*, 96 S.W.3d at 212) (emphasis added).

The Court reasoned that parties who had no agreement were in a situation no different than one in which a party executed on a non-superseded judgment. *Id.* In either event, the right to recover upon reversal would "be established as a matter of law." *Id.* The lack of an agreement "does not displace the restitution-after-reversal rule." *Id.*

Furthermore, while unnecessary to *Miga*'s application, Ponderosa effectively ratified and confirmed Illinova's conditions and reservation of its right to restitution when it accepted the Wired Funds fully aware of the terms in the Tender Letter, deposited them to its counsel's account, and distributed them to Appellees and Ponderosa's owners.[12] *See Indiana Lumbermen's Mut. Ins. Co. v. State*, 1 S.W.3d 264, 267 (Tex. App.—Fort Worth 1999, pet denied) (express rejection of

---

[12] Although Ponderosa did not expressly agree that interest would no longer accrue following the tender; that is irrelevant because an unconditional tender stops accrual of interest as a matter of law. *E.g., Trevino v. City of Houston*, 695 S.W.2d 289, 291 (Tex. App.—Houston [1st Dist.] 1985, writ ref'd n.r.e.) (holding unconditional tender halts the accrual of post-judgment interest); *see also Miga v. Jensen*, 214 S.W.3d at 90-91 (discussing effect of unconditional tender).

conditions of tender immaterial, and acceptance of conditions implied, where the recipient accepted and negotiated the tendered check); *United Concrete Pipe Corp. v. Spin-Line Co.*, 430 S.W.2d 360, 364 (Tex. 1969) (offer may be accepted by performance).

### c.      Illinova's after-the-fact accounting is irrelevant.

In an argument, the purpose of which is vague, Appellants claim Illinova treated the Wired Funds as a "settlement payment." (Appellants' Br. at 15.) There are three problems with the argument:

First, the argument, however vaguely made, seems to claim that there is a fact issue on whether Illinova made its payment with the intent to end the litigation. In FOF No. 27, the trial court found Illinova "communicat[ed] its intent to seek review and reversal of the Arbitration award." (CR:754; *see also* 1RR:36; 2RR – Plaintiff's Ex. 1 at 31 (Dynegy Inc. form 10-Q notes the Wired Funds were sent "under protest").) Appellants have not challenged that finding on appeal and, thus, it is binding. *Tenaska,* 437 S.W.3d at 526.

Second, Illinova's letters are so unequivocal in reserving Illinova's restitution claim, its intent is established conclusively.

Third, how Illinova treated the payment internally to satisfy accounting requirements is irrelevant. Those procedures had not been undertaken when the payment was made and were not communicated to Ponderosa. What is relevant is

29

what Illinova told Ponderosa in conjunction with the tender. Both the June 1 and June 7, 2007 letters informed Ponderosa that Illinova (i) was making the payment under protest; (ii) intended to challenge the arbitration award; and (iii) would seek restitution if its challenge were successful. (2RR – Joint Exs. 9, 17.)

### 3. The judgment properly implements policy concerns underlying Illinova's restitution claim.

Public policy also supports application of the *Miga* decisions to arbitration awards as well as judgments.

Texas public policy favors arbitration of disputes. *In re Tenet Healthcare, Ltd*, 84 S.W.3d 760, 768 (Tex. 2002). Appellants' position – that the rule of restitution-after-reversal does not apply to arbitration awards – puts arbitration debtors at a distinct disadvantage to judgment debtors. Such an unwarranted distinction would encourage losing parties in arbitrations to ignore their obligations under arbitration awards.

Appellants' position also lays a trap for the unwary – restitution-after-reversal would apply to one kind of adjudicative order, but not another. Appellants have not articulated a principled reason for this distinction.[13] Indeed, "the rule against recovery of voluntary payments is not applied rigidly in cases where the

---

[13] As one example why Appellants' position makes no sense, suppose the trial court had confirmed the arbitration award and, at that time, Illinova paid the award while expressing its intent to appeal. Appellants presumably would agree the voluntary payment rule would not bar a restitution claim upon subsequent reversal under *Miga II*. A different result here makes no sense.

reasons for the rule do not exist.  In some cases the payor is allowed to recover the money if he clearly never intended to surrender his position."  *R.G. McClung*, 479 S.W.2d at 743.

**B.    The Trial Court properly awarded Illinova prejudgment interest.**

The trial court's award of prejudgment interest is supported by several established principles:

First, prejudgment interest serves to compensate a party for "lost use of the money" from the time the claim accrues to the date of judgment.  *Brainard v. Trinity Universal Ins. Co.*, 216 S.W.3d 809, 812 (Tex. 2006).

Second, prejudgment interest is available in restitution actions.  *See Baltimore & O. R. Co. v. United States*, 279 U.S. 781, 786 (1929) (holding claimant who paid on erroneous judgment was entitled to restitution of the amount paid "together with interest thereon").

Third, "[w]here no statute controls the award of prejudgment interest [as is the case here], the decision to award prejudgment interest is left to the sound discretion of the trial court, which should rely upon equitable principles and public policy in making this decision."  *Citizens Nat'l Bank v. Allen Rae Inv.*, 142 S.W.3d 459, 487 (Tex. App.—Fort Worth 2004, no pet.) (citations omitted).

Fourth, Appellants have the burden to show the trial court's decision is "'arbitrary, unreasonable, and without reference to guiding principles.'"  *W. Beach*

*Marina, Ltd. v. Erdeljac*, 94 S.W.3d 248, 267 (Tex. App.—Austin 2002, no pet.) (citing *Goode v. Shoukfeh*, 943 S.W.2d 441, 446 (Tex. 1997)).

Those principles support the trial court's award.

### 1. Equity supports the trial court's prejudgment interest award.

The trial court's award is well grounded in equity. The court found, without challenge in this court, that Appellants' "intentional misconduct contributed to their unfettered use and benefit of the Wired Funds for more than three years" and earned interest thereon. (CR:756 (FOF No. 48).) Of course, Illinova was deprived of the use of its money during that time. (CR:756 (FOF No. 47).)

In its unchallenged findings, the trial court elaborated on Appellants' misconduct and considered Appellants' bad faith conduct in obtaining the arbitration award in reaching its conclusions, including the conclusion that interest should be awarded. (CR:755 (FOF Nos. 38-39).) These findings support an equitable award of prejudgment interest. *See Brainard*, 216 S.W.3d at 812.

### 2. The trial court properly determined prejudgment interest began to accrue 180 days after Illinova's June 7, 2007 Tender Letter.

The trial court's determination that the right to prejudgment interest accrued 180 days after June 7, 2007 also is supported by established principles:

● A claim for prejudgment interest accrues at the earlier of: "(1) 180 days after the date a defendant receives written notice of a claim or (2) the date the

suit is filed." *Johnson & Higgins v. Kenneco Energy*, 962 S.W.2d 507, 531 (Tex. 1998).

● A "claim" means "a demand for compensation or an assertion of a right to be paid." *Robinson v. Brice*, 894 S.W.2d 525, 528 (Tex. App.—Austin 1995, writ denied).

● Courts broadly interpret the "written notice" requirement. *See Johnson & Higgins*, 962 S.W.2d at 531-32 (tolling agreement that contained a statement reserving all of a party's rights against the other was sufficient written notice); *Town of Flower Mound v. Teague*, 111 S.W.3d 742, 763-64 (Tex. App.—Fort Worth 2003, pet. denied) (holding lawsuit filed and later dismissed constituted written notice of a claim); *Robinson*, 894 S.W.2d at 528-29 (holding that a letter by the plaintiff requesting payment for medical expenses was sufficient).

Undisputed facts establish those benchmarks. Illinova presented its claim to Appellants in the Tender Letter dated June 7, 2007, which was sent in connection with Illinova's tender of the Wired Funds. (*See* 2RR – Joint Ex. 17; CR:753 (FOF No. 26).) The Tender Letter stated that Illinova sought to vacate the arbitration award and had filed a counterclaim in the 191st District Court. (*See id.*; CR:753 (FOF Nos. 21, 26).) Illinova expressly reserved its rights to challenge the award and seek recovery of its money *plus interest*. (2RR – Joint Ex. 17.) This letter was a "written notice of a claim" that triggered the 180-day period after which

prejudgment interest began to accrue. *See Robinson*, 894 S.W.2d at 528-29. Thus, prejudgment interest began to accrue, as the trial court found, on December 5, 2007 (180 days after the June 7, 2007 Tender Letter was sent). (CR:759-60 (Conclusion of Law ("COL") Nos. 17-20).)

Appellants challenge the trial court's accrual date and rate of interest on two invalid grounds:

First, Appellants say the Tender Letter was a premature demand because Illinova had no claim for restitution until August 22, 2014, when the Texas Supreme Court denied Ponderosa's request for a rehearing. (Appellants' Br. at 42-44.) That is incorrect – Appellants confuse the accrual of a cause of action with its ultimate resolution. A cause of action accrues when facts come into existence that authorize a claimant to seek judicial relief. *See Exxon Corp. v. Emerald Oil & Gas Co.*, 348 S.W.3d 194, 202 (Tex. 2011) (citations omitted); *Johnson & Higgins*, 962 S.W.2d at 514. Facts existed supporting Illinova's challenge to the arbitration award at the time it wired the money. Indeed, Illinova filed a counterclaim challenging the award *the day before it paid the money* – on June 6, 2007 (2RR – Joint Ex. 16; *see also* CR:759 (COL Nos. 17-18)) – and subsequently asserted its claims for restitution in an amended counterclaim on October 3, 2007. (2RR – Joint Ex. 23; CR:754 (FOF No. 35).)

34

Second, contrary to Appellants' characterization of the interest rate applied as a "windfall" in the form of "high interest rates" (Appellants' Br. at 44), the trial court followed the appropriate interest rate calculation as set forth by the Texas Supreme Court and the Finance Code. (*See* CR:757 (FOF No. 55).) The supposed "windfall" is the interest rate Texas law requires for the time periods Appellants had unrestricted use of Illinova's money. Simply following the law does not create a windfall.

### 3. Prejudgment interest was properly calculated.

Equitable prejudgment interest is computed as simple interest and accrues at the rate for postjudgment interest. *Johnson & Higgins*, 962 S.W.2d at 532. Thus, the prejudgment interest rate in restitution actions is "the prime rate as published by the Board of Governors of the Federal Reserve System on the date of computation" unless such rate is below 5.00% or above 15.00%, which are a floor and ceiling respectively. TEX. FIN. CODE § 304.003(c).

The trial court calculated the prejudgment interest award by determining the interest rate set by the Federal Reserve, adjusting the rate where necessary to the minimum prejudgment interest rate of 5.00%, and applying it to the Wired Funds with interest accruing 180 days after Illinova's June 7, 2007 Tender Letter.[14] (*See*

---

[14] Appellants erroneously claim the trial court awarded prejudgment interest "from the date of its payment to Ponderosa." (Appellants' Br. at 10 (Issue 2); 41.) The trial court awarded $2,455,396.20 in prejudgment interest. (CR:714.) This amount is exactly the same – down to the penny – as the prejudgment interest amount calculated by Illinova in a bench brief provided

35

CR:757 (FOF No. 55); CR:759-60 (COL Nos. 15, 20).) The trial court correctly found the Tender Letter put Ponderosa "on notice of IGC's intent to seek recovery of the Wired Funds, plus interest." (CR:754 (FOF No. 30).) Therefore, the Tender Letter constituted a "demand for compensation and an assertion of a right to be paid" as required by Texas law. (CR:759 (COL No. 17).)

> **4. The trial court's award may also be affirmed because Illinova filed a counterclaim seeking restitution on October 3, 2007.**

Even if Illinova's Tender Letter was not sufficient "written notice" under *Johnson & Higgins*, the prejudgment interest award can be affirmed on the independent basis that Illinova asserted a counterclaim seeking restitution on October 3, 2007. (2RR – Joint Ex. 23; CR:754 (FOF No. 35).) In its Amended Answer and Counterclaim filed in the 191st District Court, Illinova challenged the validity of the arbitration award, asserted claims for unjust enrichment, money had and received, and restitution, and sought "the full return of the amount paid." *Id.*

The "date the suit is filed" was the date Illinova filed its Amended Answer and Counterclaim – October 3, 2007 – and interest also could begin to accrue from that date. *Johnson & Higgins*, 962 S.W.2d at 531. If prejudgment interest had been calculated beginning on October 3, 2007, it would have resulted in an even

---

to the trial court. That calculation showed interest beginning to accrue on December 5, 2007, which is 180 days after the June 7, 2007 Tender Letter. (CR:699; *see also* CR:760 (COL No. 20).)

36

greater award of interest than the amount awarded by the trial court. (*See* CR:699-701.) This independently supports the trial court's judgment.

Whatever approach is adopted, the trial court's award of prejudgment interest is correct and should be affirmed.

## C. The Trial Court properly enjoined Ponderosa from proceeding with the premature second arbitration against Illinova until after the conclusion of all appeals in this case

The trial court's injunction preventing Ponderosa from simultaneously proceeding on parallel tracks with its second arbitration against Illinova *and* the appeal of this case is based on undisputed facts:

- Ponderosa initiated a second arbitration against Illinova and the other Sellers on November 20, 2014. (CR:757 (FOF No. 57).)

- Ponderosa asserted the same claims in the second arbitration that it contends were settled by Illinova's payment of the Wired Funds. (CR:758 (FOF No. 59).)

### 1. Ponderosa's second arbitration against Illinova is premature given its position in this case.

Under those simple facts, if Appellants are successful in this appeal, Ponderosa's indemnity claims against Illinova necessarily will be extinguished by Illinova's payment and those claims will be moot. Thus, a second arbitration would be unnecessary. (CR:758 (FOF Nos. 60, 61).) Appellants concede the point, arguing that if they prevail, "by operation of law," Ponderosa would not be

37

entitled to assert its contractual indemnity claims against Illinova – "*Illinova will be released from its liability to Ponderosa by operation of law through its payment.*" (Appellants' Br. at 50 (emphasis added).)

Consequently, until a final appellate decision is reached on whether Ponderosa's indemnity claims against Illinova were settled and released by payment of the Wired Funds, those arbitration claims are premature.

### 2. The injunction meets the requirements for permanent injunctions under Texas law.

The requirements for a permanent injunction are "(1) the existence of a wrongful act; (2) the existence of imminent harm; (3) the existence of irreparable injury; and (4) the absence of an adequate remedy at law." *Lagos v. Plano Econ. Dev. Bd.*, 378 S.W.3d 647, 650 (Tex. App.—Dallas 2012, no pet.) (citations omitted); *see also* Appellants' Br. at 46. The last two elements — irreparable injury and lack of an adequate legal remedy — are intertwined. *Wright v. Sport Supply Grp., Inc.*, 137 S.W.3d 289, 294 (Tex. App.—Beaumont 2004, no pet.). The trial court's injunction satisfies all of these elements.

First, asserting premature claims in an arbitration constitutes a wrongful act. Without a live controversy presenting issues ripe for determination, there is nothing to arbitrate. *See, e.g.*, TEX. CIV. PRAC. & REM. CODE § 171.001(a) (providing that a written agreement to arbitrate is valid and enforceable if there is a "controversy"). Ponderosa's indemnity claims against Illinova are premature until

38

after a final appellate decision is reached on whether those claims were settled and released. Ponderosa's attempt to arbitrate claims that it contends are moot is a bad faith tactical strategy to make further litigation more expensive for Illinova.

Second, the harm that Illinova would have suffered from the premature second arbitration was imminent when the trial court issued the injunction. Ponderosa had served Illinova with a Statement of Claim and Demand for Arbitration prior to the time of trial in this case. (*See* CR:757 (FOF No. 57).) The arbitration procedures set out in the Purchase Agreement required Illinova to act *promptly*. (*See* 2RR – Joint Ex. 2, ¶ 9.2.)

As the trial court's unchallenged finding states, "[i]f Ponderosa is allowed to proceed with its new arbitration proceeding against Illinova while an appeal by Defendants is pending, it will require Illinova to take imminent, costly actions in the new arbitration proceeding, including the filing of an answering statement, the appointment of an arbitrator, engaging in expensive discovery, and making strategic decisions in the arbitration without knowing the outcome of the separate appeal of [the trial court's] judgment." (CR:758 (FOF No. 62).) In support of that finding, Mr. Kinzel testified that the first arbitration cost Illinova "approximately $500,000 to a million dollars" in legal fees and other expenses. (1RR:51.) Arbitrating the same claims eight years later likely would cost more.

Third, improperly requiring a party to arbitrate a dispute inflicts an injury for which there is no adequate remedy at law. *See CMH Homes v. Perez*, 340 S.W.3d 444, 452 (Tex. 2011); *Freis v. Canales*, 877 S.W.2d 283, 284 (Tex. 1994). Just as a party who is denied a proper arbitration cannot regain that right once the dispute has been litigated, a party who is forced to arbitrate a dispute that never should have been brought cannot regain its right to avoid arbitration after it has occurred. *Freis*, 877 S.W.2d at 284. The mandamus relief granted in *CMH Homes* and *Freis* to prevent this type of irreparable injury is based on the same foundation of equitable principles that supports injunctive relief here. *See CMH Homes*, 340 S.W.3d at 453 (stating that mandamus is controlled largely by equitable principles); *Alex Sheshunoff Mgmt. Servs., L.P. v. Johnson*, 209 S.W.3d 644, 656 n.8 (Tex. 2006) (stating that injunctive relief is an equitable remedy subject to equitable principles).

Moreover, having to defend against the premature claims in the second arbitration while simultaneously responding to this appeal would have put Illinova at a significant strategic disadvantage. Ponderosa and the other Sellers (Tenaska and Continental) already have "appointed an arbitration panel in the second arbitration and are proceeding with that arbitration." (Appellants' Br. at 21.) It is virtually certain that an award in the second arbitration will be issued before Ponderosa's appeal in this case becomes final – the arbitration agreement provides

the arbitration hearing "must commence on or before the 60th day, following the designation of the … arbitrators" and that the arbitrators shall render a decision "on or before the 30th day following the last session of the hearing." (2RR – Joint Ex. 2, ¶¶ 9(d), (f).) If Illinova had to defend against Ponderosa's premature second arbitration and the panel issued an award more favorable to Ponderosa than the value of the Wired Funds, Ponderosa could simply dismiss this appeal and pursue collection of the second arbitration award from Illinova. On the other hand, if the second arbitration panel issued an award that favored Illinova, Ponderosa could disregard that award and continue its attempt in this appeal to keep the Wired Funds.

Illinova's disadvantaged position is exacerbated by the fact that there is no mechanism in the Purchase Agreement's arbitration clause that would enable Illinova to recover its arbitration fees and costs if it turns out that the second arbitration against Illinova was unnecessary. (1RR:51.) This is true, in part, because the arbitration clause in the Purchase Agreement provides for a "Baseball Arbitration" format. (*See* 2RR – Joint Ex. 2, ¶ 9.2(e).) Under this format, "each party shall submit a brief with a single proposal for settlement, and the decision of the … arbitrators shall be limited to selecting only one of the two proposals submitted by the parties." (*Id.*) Appellants acknowledge that Illinova has no statutory or contractual basis to recover attorneys' fees. (*See* Appellants' Br. at

48.) Thus, Illinova would have no adequate remedy at law for recovering any incurred legal fees or other defense costs in the event the second arbitration is unnecessary.

Appellants' dismissive argument that all Illinova "would be out is a little bit extra money" (1RR:16) ignores reality. No amount of money damages could adequately compensate Illinova for the unfair "heads I win, tails you lose" situation it would face if Ponderosa was allowed to pursue a second arbitration against Illinova and then, depending on the outcome of the second arbitration, elect whether to pursue collection of the second arbitration award or continue the appeal of this case based on Illinova's alleged voluntary payment.

### 3. The injunction appropriately preserves the status quo.

The cases Appellants cite regarding heightened requirements for "mandatory" injunctions (Appellants' Br. at 46-47) are inapplicable here because the trial court's prohibitory injunction properly preserves the status quo between the parties until all appeals are concluded.

Although the trial court's injunction required Appellants to withdraw Ponderosa's November 2014 Statement of Claim and Demand for Arbitration (CR:714), that was part of the status quo. The "action" that Appellants were required to take was procedural in nature and did not change the parties' status in the second arbitration because nothing had happened yet in that proceeding. At a

hearing on Illinova's application for a temporary restraining order to stop the second arbitration, which was held within days after Ponderosa served its demand for a second arbitration, Ponderosa's counsel agreed "that any obligation that the Plaintiff Illinova has with regard to the arbitration [Ponderosa] is willing to stay until after this Court has had an opportunity to rule which will happen soon after, literally within days of the December 15th trial." (Supp. RR:19.) In return for this agreement, Illinova withdrew its application for a TRO. *Id.*

### 4. Weighing the relative harm to the parties favors injunctive relief.

The trial court also properly weighed equitable considerations in Illinova's favor in issuing the injunction. "The principles governing courts of equity govern injunction proceedings if not in conflict with [Chapter 65 of the Texas Civil Practice & Remedies Code] or other law." TEX. CIV. PRAC. & REM. CODE § 65.001. "In balancing the equities, the trial court must weigh the harm or injury to the applicant if the injunctive relief is withheld against the harm or injury to the respondent if the relief is granted." *Seaborg Jackson Partners v. Beverly Hills Sav.*, 753 S.W.2d 242, 245 (Tex. App. – Dallas 1988, writ dism'd).

Ponderosa's counter-argument to the serious harm that Illinova would have suffered without the injunction is nonsense. It says that "denying Ponderosa both the funds Illinova paid from the first arbitration and the right to prosecute its claim in a second arbitration against Illinova *leaves Ponderosa with no remedy at all*.

43

Equity should intervene to fix this unjust result." (Appellants' Br. at 51 (emphasis added).) To the contrary, if Ponderosa prevails in this appeal it presumably will be entitled to the Wired Funds paid by Illinova. If on the other hand, Ponderosa loses this appeal, then it will be able to bring its indemnity claims in a new arbitration against Illinova. The trial court's judgment is very clear that the *latest* date to which the injunction can extend is "the date the mandate issues at the conclusion of all appeals of this judgment if a timely appeal from this modified final judgment is filed." (CR:714.) Thus, Ponderosa will be free to initiate a new arbitration against Illinova if it is determined on appeal that Ponderosa's indemnity claims against Illinova were not settled and released when Illinova paid the Wired Funds to Ponderosa and its counsel.[15]

### D. The Trial Court properly held Appellants jointly and severally liable.

When sitting in equity, the trial court had broad discretion to impose joint and several liability. Illinova's claims for restitution and unjust enrichment sound in equity. *Peake,* 178 S.W.3d at 776-78. "Matters of equity are addressed to the trial court's discretion." *Boquet v. Herring*, 972 S.W.2d 19, 21 (Tex. 1998) (citations omitted). The trial court's imposition of joint and several liability is thus subject to an abuse of discretion standard of review. *Long v. Elliott*, 416 S.W.3d

---

[15] Additionally, Ponderosa could have elected to not appeal the trial court's judgment regarding Illinova's restitution claim, which would have eliminated the need for the injunction and permitted Ponderosa to proceed with its second arbitration against Illinova.

152, 162 (Tex. App.—Eastland 2013, no pet.) (holding trial court did not abuse its discretion by imposing joint and several liability with respect to subrogation claim in which tort plaintiffs were paid funds that belonged to the subrogee); *see also Edwards v. Mid-Continent Office Distribs., L.P.*, 252 S.W.3d 833, 836 (Tex. App.—Dallas 2008, pet. denied) ("a trial court exercises broad discretion in balancing the equities involved in a case seeking equitable relief."). The trial court's ruling will not be disturbed unless it is arbitrary, unreasonable, and unsupported by guiding rules and principles. *Edwards*, 252 S.W.3d at 836.

### 1. Appellants jointly promised to pay interest.

Joint and several liability is appropriate where "two or more persons promise the same performance." *Bluestar Energy, Inc. v. Murphy*, 205 S.W.3d 96, 99 (Tex. App.—Eastland 2006, pet. denied); *see Guynn v. Corpus Christi Bank & Trust*, 620 S.W.2d 188, 190 (Tex. Civ. App.—Corpus Christi 1981, writ ref'd n.r.e.). Where there is a promise that "we or either of us" will pay a judgment, the liability will be deemed to be joint and several. *Guynn*, 620 S.W.2d at 190.

Appellants did just that. In 2010, to avoid depositing an additional amount into the Escrow Account to cover prejudgment interest, Ponderosa's counsel represented to the trial court that "the Lender Group, along with Nixon Peabody and Shannon Gracey, would pay prejudgment interest" if it was included in the final judgment. (CR:755 (FOF No. 43); CR:760 (COL No. 23); *see also* 1RR:42-

45

44) Illinova and the trial court both relied on counsel's representation. (*See* 1RR:44; CR:171.) Appellants were relieved of the obligation to escrow prejudgment interest because they promised to be jointly responsible for that obligation if it was included in a final judgment. Holding a party to words spoken to a court is undoubtedly equitable. (CR:760 (FOF No. 23).)

Appellants complain that counsel's "vague reference to 'other defendants' is not sufficient to render Nixon Peabody and Shannon Gracey liable for all, or part, of Ponderosa's debt." (Appellants' Brief at p. 53 n. 15.) There are two obvious responses:

First, there were only three defendants in the trial court. The trial court's order specifically referred to the financial institutions owning an interest in Ponderosa (CR:171) – the only "other defendants" were the law firms.

Second, Appellants confuse the issue. Appellants are not being held liable for Ponderosa's "debt;" they are being held jointly and severally liable for the prejudgment interest they promised to pay in exchange for not having to deposit an additional amount into the Escrow Account in 2010.

### 2. Joint and several liability is proper because Appellants acted in concert in withholding the Wired Funds.

Joint and several liability also is equitable in cases where defendants act in concert to withhold money, as they did here. *See Dorough v. Thornton*, 450 S.W.2d 424, 428 (Tex. Civ. App.—Fort Worth 1970, writ ref'd n.r.e.). In

46

*Dorough*, three defendants individually purchased 1/3 interests of a business owned by the testator. *Id.* at 427. Under the testator's will, the total of the operating capital of the business was to pass to the plaintiff (the testator's wife). *Id.* However, after the defendants purchased their respective interests in the business, they withheld most of the operating capital from plaintiff. *Id.* The court held that joint and several liability was proper because "all three of them—acting in concert—withheld the cash in question." *Id.* at 428. Here, Illinova similarly paid the Wired Funds into Nixon Peabody's trust account, the funds were then disbursed among the Appellants, and they acted in concert by withholding the Wired Funds from Illinova.

Nothing is gained by the argument that Appellants should not be jointly and severally liable because the arbitration award was issued in favor of Ponderosa, not its counsel. (Appellants' Br. at 52.) Appellants acted in concert in distributing the Wired Funds among themselves and collectively withheld those funds even after the award was vacated. Nixon Peabody's and Shannon Gracey's status as counsel for Ponderosa does not exempt them from having to compensate Illinova for its loss of the benefit of the Wired Funds – funds for which they had unfettered use.

The foregoing factors affirm that imposing joint and several liability was supported by evidence and thus not an abuse of discretion.

**3. Equity and public policy support joint and several liability.**

Texas favors the policy of providing plaintiffs with full relief. *See, e.g., Zodiac Corp. v. Gen. Elec. Credit Corp.*, 566 S.W.2d 341, 346 (Tex. Civ. App.—Tyler 1978, no writ). As a result of Ponderosa's bankruptcy, it is now owned by a group of eight banks that make up the Lender Group. (*See* CR:752-53 (FOF Nos. 6-8).) Illinova should not bear the burden of tracking down the recipients that received the money from Ponderosa, or the risk that one or more of those entities is now insolvent. *See Duncan v. Cessna Aircraft Co.*, 665 S.W.2d 414, 429 (Tex. 1984) (where a defendant is or may be insolvent, joint and several liability 'furthers the fundamental policy of tort law to compensate those who are injured.'). Appellants, having accepted and disbursed Illinova's money, should bear the risk that one or more of the entities to which they disbursed the money may not pay back its share. It would be inequitable to put Illinova to the expense and delay of potentially having to sue eight different banks, in addition to Appellants, if they refused to pay their shares of the prejudgment interest. Joint and several liability is a "judicially created vehicle[] for enforcing remedies for wrongs committed." *Dutcher v. Owens*, 647 S.W.2d 948, 950-51 (Tex. 1983).

Appellants' intentional misconduct led to a wrongful arbitration award and Illinova's payment of the Wired Funds. After the award was vacated, Appellants,

acting in concert, wrongfully withheld Illinova's money. Public policy and equity favor holding Appellants jointly and severally liable.

## PRAYER

For the foregoing reasons, Illinova requests the Court to affirm the district court's judgment and for such other and further relief to which it shows itself entitled.

Respectfully submitted,

LOCKE LORD LLP

/s/     Thomas F. Loose
Thomas F. Loose
   *tloose@lockelord.com*
   State Bar No. 12561500
Bradley C. Weber
   *bweber@lockelord.com*
   State Bar No.*21042470*
LOCKE LORD LLP
2200 Ross Avenue, Suite 2200
Dallas, Texas 75201-6776
(214) 740-8000
(214) 740-8800 Fax

Mike A. Hatchell
   *mahatchell@lockelord.com*
   State Bar No. 09219000
LOCKE LORD LLP
600 Congress Avenue, Suite 2200
Austin, Texas  78701-2748
(512) 305-4700
(512) 305-4800 Fax

ATTORNEYS FOR APPELLEE

**CERTIFICATE OF COMPLIANCE**

Pursuant to Texas Rule of Appellate Procedure 9.4(i)(3), as amended effective December 1, 2012, the undersigned certifies that this Brief complies with the length limitations of Rule 9.4(i) and the typeface requirements of Rule 9.4(e).

1.      Exclusive of the contents excluded by Rule 9.4(i)(1), this Brief contains 11,959 words as counted by the Word Count function (including textboxes, footnotes, and endnotes) of Microsoft Office Word 2010.

2.      This Brief has been prepared in proportionally spaced typeface using:

Software Name and Version:  Microsoft Office Word 2010

Typeface Name:  Times New Roman

Font Size:  14 point

/s/      Thomas F. Loose
Thomas F. Loose

**CERTIFICATE OF SERVICE**

I hereby certify that on the 1st day of July, 2015, a true and correct copy of Appellees' Brief was electronically served by eFileTexas and electronic mail on Appellants through their counsel of record listed below:

B. Frank Cain
Joseph W. Spence
Shannon, Gracey, Ratliff & Miller, LLP
420 Commerce Street, Suite 500
Fort Worth, Texas  76102
(817) 882-7614
(817) 336-3735 Fax

Frank H. Penski
Constance M. Boland
Abigail T. Reardon
Nixon Peabody LLP
437 Madison Avenue
New York, New York  10022
(212) 940-3000
(212) 940-3111 Fax

/s/      Thomas F. Loose
Thomas F. Loose